UNITED STATES of America, Plaintiff-Appellee,

v.

Robert BOCKIUS, Defendant-Appellant.

No. 77–5128.

United States Court of Appeals, Fifth Circuit.

Dec. 22, 1977.

Selig I. Goldin, Gainesville, Fla., for defendant-appellant.

Jack V. Eskenazi, U. S. Atty., Nathaniel H. Speights, Asst. U. S. Atty., Joel C. Fanning, Sp. Asst. U. S. Atty., Miami, Fla., for plaintiff-appellee.

Before WISDOM and GEE, Circuit Judges, and VAN PELT,* District Judge.

WISDOM, Circuit Judge:

L-cocaine or D-cocaine? That is the question. There are eight isomers of cocaine, but allegedly the only illegal form is the L-cocaine isomer.[1]

Robert Bockius was charged with knowingly importing cocaine into the United States in violation of 21 U.S.C. § 952(a) and 960(a)(1) and possessing cocaine with intent to distribute it in violation of 21 U.S.C. § 841(a)(1). The defendant complains that the government did not inform him before trial that it had conducted the critical polarimeter test to identify the substance he brought into the country as L-cocaine. The government could argue, however, that defense counsel set a trap—into which he fell. At the last moment, apparently to surprise the government, he produced as the chief trial lawyer the architect of the chemical defense theory in prosecutions over the importation, possession, or sale of cocaine. This theory rests on the scientific basis that absent a polarimeter test, government testing procedures to determine whether cocaine is L-cocaine are not conclusive. The defendant doth protest too much. The government had not received the results of that test before the trial began and did not use the results in presenting its case against the defendant; knowledge of its having been conducted came out in cross-examination. The district judge recessed the trial to enable the defendant's expert to perform his own polarimeter test. This he did. There was much throwing about of brains. Defense counsel exhibited models of the molecular structure of cocaine isomers and skillfully extracted from his expert and the government expert as much or more knowledge of the cocaine isomers than a jury could absorb. The question was for the jury. The jury decided it against the defendant. We affirm.

I.

Bockius returned to the United States from Colombia, South America, in September 1976. He aroused the suspicion of customs agents at the Miami International Airport. They searched him, and found 332.1 grams of a white powder concealed in his shoes. Field tests identified the powder

---

* Senior District Judge of the District of Nebraska, sitting by designation.

1. For purposes of this appeal, we will assume, without deciding, that of the eight cocaine isomers L-cocaine is the only illegal form of the drug. The case was tried below on the assumption that this is the proper construction of the law. This appeal does not require us to rule on the validity of that construction, and we specifically reserve the question.

The Courts of Appeals for the Seventh and Ninth Circuits have considered appeals based on the cocaine isomer theory used by defense counsel. In United States v. Orzechowski, 7 Cir. 1977, 547 F.2d 978, the Court ruled that a jury could find a substance to be L-cocaine even though the government expert had not conducted a polarimeter test. 547 F.2d at 982. In United States v. Hall, 9 Cir. 1977, 552 F.2d 273, the government expert conceded that none of the tests he performed could distinguish L-cocaine from D-cocaine. The Court concluded, however, that the jury could decide on the basis of circumstantial evidence that the seized substance was L-cocaine.

In addition, both courts refused to require district courts to instruct specifically that D-cocaine is not chemically identical or equivalent to coca leaves and any salt, compound, derivative or preparation thereof. Instead, the Courts approved instructions that left to the jury a factual question whether the cocaine isomers other than L-cocaine fall within the statutory prohibition. United States v. Hall, 552 F.2d at 274; United States v. Orzechowski, 547 F.2d at 985; United States v. Umentum, 7 Cir. 1977, 547 F.2d 987, 992–93. The Seventh Circuit has held that an instruction on the meaning of the statutory phrase "chemically equivalent or identical" is unnecessary because "[t]he terms have a common meaning and were used in the conventional sense". United States v. Orzechowski, 547 F.2d at 986. The Ninth Circuit has not ruled on the need for such an instruction. United States v. Hall, 552 F.2d at 273.

as cocaine, a Schedule II narcotic controlled substance.

When Bockius was arraigned, the magistrate entered a standing discovery order. This order largely tracked the language of Rule 16 of the Federal Rules of Criminal Procedure. Among other things, it required the prosecution to "immediately reveal" to opposing counsel the results of scientific tests or experiments made in connection with the case.

The day before trial, the prosecution learned that James Shellow, well known as an expert in defending cocaine charges, would join Bockius's two attorneys who had already filed notices of appearance. Shellow had originated a sophisticated scientific defense grounded in the chemistry of cocaine. In the trial he conducted what may properly be described as an extraordinarily able examination of the witnesses, based on his knowledge of the chemistry of cocaine.

Schedule II of controlled substances, 21 U.S.C. § 812 includes:

> Coca leaves and any salt, compound, derivative, or preparation of coca leaves, and any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances . . .

According to Shellow's theory, which is generally accepted in the scientific community, only one of the eight cocaine isomers, L-cocaine, falls within the Schedule II definition.[2] D-cocaine has a molecular structure that is the mirror image of L-cocaine. Often the two are found mixed. The government, therefore, had to prove that the substance in question was L-cocaine, rather than another form of the drug.

The Assistant United States Attorney handling the case was wise enough to confer with a United States Attorney in another office who had faced Shellow before. He learned that Shellow's trial strategy was to show that the Government had not met its burden of proof. This Shellow did by impeaching government testing procedures. His tactic was to contend that to identify L-cocaine, the government scientists should conduct a polarimeter test.[3]

Until acquiring this information, the United States Attorney in the case had not requested the government expert, Donald A. Cooper, to conduct a polarimeter test. The United States Attorney asked him to do so, but had not received the results of this belated test when he began to present his case. Nor did he know about the results during direct examination.[4] The expert Cooper relied upon other tests to establish that the substance in question was L-cocaine.[5] Shellow, during cross-examination, asked Cooper if he had conducted the polarimeter test. Cooper answered affirmatively and stated that the substance taken from Bockius's shoes was L-cocaine.

After the trial judge allowed the jury to leave for lunch, the defense complained about the last minute polarimeter test. The following colloquy then took place:

---

**2.** The eight forms are D-cocaine, L-cocaine, D-pseudo-cocaine, L-pseudo-cocaine, D-allocaine, L-allocaine, D-alpha cocaine, and L-alpha cocaine. The L and the D refer to the direction a crystal will rotate plane-polarized light passed through it—L to the left (counterclockwise), and D to the right (clockwise).

**3.** A polarimeter measures the angle of rotation of a plane of polarized light that results when the light is passed through certain transparent materials. The effect a substance has on polarized light is closely related to its chemical structure.

**4.** During direct examination of Cooper there was one oblique reference to the polarimeter test. After Cooper had described the tests he initially conducted, the Assistant United States Attorney asked "Did you perform any other tests on the cocaine in question?". Cooper responded "Not at that time, sir".

**5.** Cooper's main test, which he invented, involves adding some gold chloride reagent to the substance to be analyzed. This precipitates a crystal. According to Cooper, D-cocaine and L-cocaine precipitate distinguishable crystals, so the test can be used to tell one from the other. The defense presented testimony that this test is not proper because by changing the relative amount of either the cocaine or the gold chloride, or the total amount of either or both, the researcher can change the crystal shape. Despite this testimony the judge allowed the jury to consider the results of Cooper's gold chloride test. This decision is not challenged on appeal.

THE COURT: How long does it take to run that test?

MR. SHELLOW: About 20 minutes.

THE COURT: You have got Mr. Shapiro [the defense expert] here. I want the Government to make its lab available to Dr. Shapiro to make his own test.

MR. SPEIGHTS: Objection, Your Honor.

THE COURT: I don't care.

To give Dr. Shapiro time to conduct his test, the court excused the jury until the next morning. He told them:

Ladies and gentlemen, we have run into a problem. I don't know whether you were here when I ordered the government to make available to Dr. Shapiro this substance so he could make his own test. That is what they are doing now. The test will not be ready until two o'clock. . . . It might be better if we would just recess for the afternoon and have you come back tomorrow morn-. ing at 9;00 o'clock.

The defense did not object to this comment. It did move, however, to strike all of Cooper's testimony on the ground that the government had violated the discovery order. The court denied this motion.

The next day, Dr. Shapiro testified that his polarimeter test showed that the substance found in Bockius's shoe was not L-cocaine. The court's instructions incorporated the L-cocaine theory of the defense. The jury convicted on both counts of the indictment.

## II.

◼ We assume that under the standing discovery order the government should have informed the defense before the trial began that it had requested a polarimeter test. Generally, the choice of remedy for a violation of discovery requirements rests with the trial judge. *E. g., United States v. Saitta*, 5 Cir. 1971, 443 F.2d 830; *Gevinson v. United States*, 5 Cir. 1966, 358 F.2d 761. This discretion will be overturned and a new trial ordered only if the defendant can show that a shortcoming in discovery caused prejudice not cured by the trial court's remedy. *See United States v. Saitta*, 443 F.2d at 831; *Hansen v. United States*, 8 Cir. 1968, 393 F.2d 763.

◼ Bockius charges prejudice because he was forced, at the last minute, to change his strategy from one of impeaching the thoroughness of government testing procedure to one of rebutting the actual test results. We do not sympathize with the defense attorneys' dismay when they discovered that their impeachment defense had been anticipated; obviously they had expected to surprise the government. The government properly conducted tests necessary to turn back the impeachment attack. The question is whether the defendant had an adequate opportunity to prepare a defense in response to the government's case.

The district court's order that the government make its facilities available to Dr. Shapiro provided that opportunity. Indeed, Dr. Shapiro flatly testified that the substance found in the appellant's shoes was not L-cocaine. Appendix at 244–45. The appellant now complains that the district court did not give the defense enough time. In his brief, the appellant argues "this last minute test . . . put Shapiro in a bad light because he had to rush and rely upon various government equipment and data which undermined the credibility of his testimony". Appellant's brief at 17. Bockius also contends that he might have brought in a second expert to bolster Dr. Shapiro's testimony had he realized it was necessary to rebut actual test results and that "there was no way for Defendant with one expert to properly evaluate the Government polarimeter because no data was provided to the Defendant".

The record discloses no place where the defense brought these problems to the trial judge's attention. Instead, the defense told the court that twenty minutes was all Dr. Shapiro needed. If Dr. Shapiro had needed certain data to evaluate the government's test, the defense should have asked for time and the trial judge could have ordered the government to produce the tests to be evaluated. If Dr. Shapiro really needed more

time, or if the defense wanted an opportunity to recruit a second expert, defendant's experienced counsel should have asked the court for more time.

Bockius relies upon *United States v. Kelly*, 2 Cir. 1969, 420 F.2d 26. The defendants in *Kelly* were police officers accused of selling through a third party cocaine they had seized during a narcotics raid. To prove that the cocaine sold by the officers came from the batch of drugs seized in the original raid, the prosecutor introduced the results of a neutron activation test. Although the test had been performed well before trial, the government did not honor its obligation under the discovery rules to reveal it to the defense. The defense asked for a continuance to perform its own test, which would have taken at least three weeks. The trial court denied this motion and the trial proceeded without interruption. The Court of Appeals reversed, holding that the defense must have a fair opportunity to conduct its own test and condemning the government's unannounced use of the test as an "ambush" in violation of the spirit of the criminal discovery rules. 420 F.2d at 28–29.

In *United States v. James*, 5 Cir. 1974, 495 F.2d 434, this Court distinguished *Kelly* from a situation where the defense is able to respond to the undiscovered evidence. 495 F.2d at 437. Because in this case the district court gave the defense access to government facilities, Dr. Shapiro was able to testify against the results of the government's polarimeter test. This Court and others have also declined to follow *Kelly* when the defense did not ask for a longer recess or for a continuance to prepare a response to the undiscovered evidence. *See United States v. James*, 495 F.2d at 437; *United States v. Russo*, 6 Cir. 1973, 480 F.2d 1228; *United States v. Cook*, 7 Cir. 1970, 432 F.2d 1093. The failure of defense counsel to ask the trial court for more than half a day, as he now contends he needed, brings him within these cases.

The two other cases discussed in the appellant's brief do not support a reversal of this conviction. In *United States v. Baum*, 2 Cir. 1973, 482 F.2d 1325 the government failed to provide the names, addresses, and prior records of all witnesses the government planned to call at trial. As a result, the defendant could not effectively challenge a witness called to testify about a prior offense of the defendant. 482 F.2d at 1325. Here, the order, in contrast, allowed the defendant to challenge the government testimony.

In *United States v. Padrone*, 2 Cir. 1969, 406 F.2d 560 the government inadvertently did not inform the defense that it had a statement given by the defendant. Defense counsel allowed Padrone to take the stand without realizing the witness would be open to effective cross-examination based on prior inconsistent statements. The Court, reversing, pointed out that Padrone's trial strategy may have been determined by the government's action. The appellant contends that his case resembles *Padrone* because he, too, had to change his defense strategy. But, in *Padrone* it was impossible for the trial judge to erase the effect of the government's cross-examination. In this case, the trial judge was able to counteract the use of undisclosed evidence by giving the defense the time it requested to prepare its response. Moreover, in *Padrone*, the government's inadvertence affected Padrone's choice whether to exercise his constitutional right to remain silent. No such right is involved here.

The appellant's claim of prejudice must be weighed in the context of the actions by his own counsel. Shellow's involvement was concealed from the government until the day before the trial. The defense gave no indication it would rely upon the inadequacy of the government testing procedures. Defense counsel share responsibility for the events of which they complain. If the government had known earlier of the need to conduct a polarimeter test, it could have, and we are sure it would have, arranged the test and informed the defense of the results well before trial.[6] The appellant

---

6. The appellant argues that he was not required to reveal the name of counsel or his

anticipated defense strategy. Nevertheless, the defense should have anticipated that the

then would have had ample time to analyze the seized substance as thoroughly as his counsel and experts desired. There was an attempted ambush in this case, but, unlike *Kelly*, the defense was the predator.[7]

### III.

 Bockius argues that his conviction should be reversed because the trial judge improperly shifted the burden of proof to the defense when he explained to the jury why a recess had been called during the trial. The appellant reasons that since the jury knew that Dr. Shapiro had conducted a test, it would assume that the results damaged the defense unless he testified. The appellant argues, therefore, that the trial judge's comment forced him to call the expert to the stand even though the defense attorneys might have feared that Dr. Shapiro's testimony could be undermined by the government.

 Because there was no objection to the trial court's statement, we must review this contention of error under the plain error standard. *See, e. g., United States v. Cox*, 5 Cir. 1976, 536 F.2d 65.

The trial judge correctly instructed the jury that the government had the burden of proof. The cases cited in the appellant's brief concerning jury instructions, improperly placing the burden of proof on the defendant, are not on point. As a practical matter, the trial judge's comment did not increase the pressure on the defense to call a witness to rebut Dr. Cooper's testimony. If Dr. Shapiro had not testified, the jury would have heard uncontradicted expert

testimony that the substance found in the defendant's shoe was the illegal L-cocaine isomer. In these circumstances, we find no plain error in the trial judge's comment.

The judgment is AFFIRMED.

---

government would make last minute adjustments in its case if it discovered Shellow would participate in the case. Even if the defense had the right to conceal Shellow's involvement until the day before the trial, it must bear responsibility for the difficulty this created for the government both in readying its case and in complying with the discovery order.

7. The appellant also contends that the government violated the discovery order by not providing two photographs of the crystals formed when L-cocaine and D-cocaine are mixed with gold chloride. The photographs were used as general illustrations of the gold chloride technique. They were not photographs of the crystals formed by the substance found in the appellant's shoes. Defense counsel learned of the photographs the day before they were introduced, during questioning of Cooper by the Judge outside the presence of the jury. Defense counsel had no difficulty cross examining Cooper about the gold chloride technique. The defense's expert witness was familiar with the test and ready to testify that it was an inappropriate method of distinguishing L-cocaine for D-cocaine. We find no evidence that the use of the photographs prejudiced the defense.