Carl Elliott MOORE, Appellant,

v.

STATE of Oklahoma, Appellee.

No. F–84–65.

Court of Criminal Appeals of Oklahoma.

July 13, 1987.

Lee E. Witcher, Oklahoma City, for appellant.

Robert H. Henry, Atty. Gen., Tomilou Gentryt Liddell, Asst. Atty. Gen., Oklahoma City, for appellee.

## OPINION

PARKS, Judge:

The appellant, Carl Elliott Moore, was charged, tried and convicted in the District Court of Garfield County, Case No. CRF–82–531, for the following three offenses: Count I, Unlawful Possession of a Controlled Dangerous Substance; Count II, Unlawful Possession of a Controlled Dangerous Substance with Intent to Distribute; and Count III, Unlawful Possession of a Weapon in the Commission of a Felony. The jury assessed punishment at a term of nineteen (19) years imprisonment and a fine of Twenty-Thousand ($20,000.00) Dollars for Count I, a term of nineteen (19) years imprisonment and a fine Of Twenty-Thousand ($20,000.00) Dollars for Count II, and a term of ten (10) years imprisonment for Count III; Counts I and II to run consecutively, with Count III to run concurrently with Count II. We reverse.

On November 30, 1982, a police informant made two taped phone calls from the Bureau of Narcotics in Enid to the appellant in Tulsa. The phone conversations were in reference to the purchase of cocaine. The appellant agreed to sell the informant three ounces of cocaine at $2,000.00 an ounce. This transaction was to occur the following day.

On the next day, the informant went to the Bureau of Narcotics where he and his automobile were searched. A transmitter was placed on his chest and a tape recorder was placed in the glove compartment of the informant's vehicle. The informant was then given $6,600.00 in cash.

The informant drove to Garber where the transaction was to occur. The informant was followed by two narcotics agents, who monitored the transaction. Upon the informant's arrival at the predisclosed location, the appellant entered the informant's automobile. The appellant exchanged three ounces of a white, powdery substance, allegedly cocaine, for the predetermined price of $6,600.00 The appellant told the informant that he had a fourth ounce of cocaine if the informant needed it. He declined.

The appellant returned to his vehicle and drove away. A narcotics agent and a Garfield County Sheriff's unit apprehended the appellant nearby. Upon apprehension, the appellant was found carrying a handgun in his left coat pocket and his right coat pocket contained a blue sock. The sock held an ounce of a white, powdery substance, again allegedly cocaine, and sixty-six one-hundred dollar bills. The informant was also stopped nearby and three ounces of alleged cocaine were recovered. At trial, the State's expert witness described the white, powdery substance as cocaine.

### I.

The appellant raises nine assignments of error before the Court. Since his first assignment has merit, we dispose of the case on that ground alone. In this assignment of error, the appellant contends that the trial court erroneously denied discovery of samples of the substance tested, test reports and the results of the State's scientific evidence. We agree. Discovery of such evidence was paramount to the appellant's theory of defense in this case. The appellant's defense rested upon the so-called "cocaine isomer strategy," *see United States v. Ortiz*, 610 F.2d 280 (5th Cir. 1980), which is a sophisticated and technical scientific theory of defense based on the

molecular chemistry of cocaine. Although this defense has been recognized for several years in the Federal Courts, this is apparently the first time the theory has been brought before this Court.

The defense arises from the somewhat cryptic language of the statute which defines the controlled substance. In Oklahoma, cocaine is defined in 63 O.S.1981, § 2–206(A)(4), to wit:

Coca leaves and any salt, compound, derivative, or preparation of coca leaves, and any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances, but not including decocainized coca leaves or extractions which do not contain cocaine or ecgonine.

This definition is almost identical to the federal statute which defines cocaine in Schedule II(a)(4) of 21 U.S.C. § 812(c) (1976).[1]

■ The appellant's expert witness' testimony was consistent with similar federal cases.[2] These experts describe cocaine's chemical composition as $C_{17}H_{21}NO_4$ which has several isomers.[3] We hold today that under our statute, all isomers of cocaine are not controlled substances. We arrive at this conclusion for three reasons. *First,* only one isomer, L-cocaine, is a derivative of the coca leaf, according to the testimony of both the State and defense experts (Tr. 510, 531, 535). *See also United States v. Ross,* 719 F.2d 615, 617 (2d Cir.1983). Any other "isomer" of cocaine is controlled by statute only if it is "chemically equivalent or identical" with the substance derived from the coca leaf. 63 O.S.1981, § 2–206(A)(4).

*Second,* we have held that criminal statutes are to be strictly construed. *Ritchie v. Raines,* 374 P.2d 772 (Okl.Cr.1962). *Cf. State ex rel. Thompson v. Ekberg,* 613 P.2d 466 (Okl.1980). On its face, this subsection does not prohibit all isomers of cocaine, just those that are "chemically equivalent or identical" with the substance derived from the coca leaf. Therefore, we believe it is a reasonable construction of the subsection to hold that not all isomers of cocaine are controlled.

*Third,* this Court has held that statutory provisions may be regarded *in pari materia,* where they are part of the same statute. *Ex Parte Higgs,* 97 Okl.Cr. 338, 263 P.2d 752 (1953). Regarding subsection (A)(4) in the instant case, this subsection is most appropriately read *in pari materia* with the other subsections of section 2–206. We initially note that subsections (A)(2), (B), and (C) of section 2–206 all specifically mention the "isomers" of each individual controlled substance included within each subsection.[4] We therefore believe that the

1. Schedule II(a)(4) of 21 U.S.C. § 812(c) (1976) defines cocaine as:

    Coca leaves and any salt, compound, derivative, or preparation of coca leaves, and any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances, except that the substances shall not include decocainized coca leaves or extraction of coca leaves, which extractions do not contain cocaine or ecgonine.

2. *See, e.g., United States v. Ross, supra; United States v. Ortiz, supra, United States v. Luschen,* 614 F.2d 1164 (8th Cir.1980); *United States v. Hall,* 552 F.2d 273 (9th Cir.1977); *United States v. Wilburn,* 549 F.2d 734 (10th Cir.1977); and *United States v. Umentum,* 547 F.2d 987 (7th Cir.1976).

3. Isomers are compounds which have the same molecular formula, but have different structures. T. Brown & H. LeMay, Jr., *Chemistry: The Central Science* 721 (1977).

4. 63 O.S.1981, § 2–206 provides:

    The controlled substances listed in this section are included in Schedule II.

    A. Any of the following substances except those narcotic drugs listed in other schedules whether produced directly or indirectly by extraction from substances of vegetable origin, or independently by means of chemical synthesis, or by combination of extraction and chemical synthesis;

    &ast;   &ast;   &ast;   &ast;   &ast;   &ast;

    Any salt, compound, *isomer,* derivative, or preparation thereof which is chemically equivalent or identical with any of the substances refered to in paragraph 1, but not including the isoquinoline alkaloids of opium.

    &ast;   &ast;   &ast;   &ast;   &ast;   &ast;

    B. Any of the following opiates, including their *isomers,* esters, ethers, salts, and salts of *isomers,* esters, ethers and salts is possible within the specific chemical designation:

    &ast;   &ast;   &ast;   &ast;   &ast;   &ast;

word "isomer" was intentionally omitted from subsection (A)(4).

As a practical matter, this reasoning is supported by the testimony of Robert H. Shapiro, Ph.D., Chairman of the Department of Chemistry at James Madison University. Dr. Shapiro testified that some isomers of cocaine are utilized in various over-the-counter products, such as cough syrup and cold tablets. Another isomer of L-cocaine is D-cocaine, an innocous powder, according to testimony. The physical properties of these isomers are different and distinct from L-cocaine, the controlled stimulant derived from the coca leaf. Therefore, the statute is appropriately limited to substances derived from the coca leaf and those which are chemically equivalent or identical thereto.

Based on this theory of defense, counsel for the appellant intended to show that the substance seized and evaluated by the State was not L-cocaine or its chemical eqivalent, but rather the substance was a harmless isomer of the controlled narcotic. Without the substances actually used by the State in making its evaluation, or the technical reports detailing the State's examination, the appellant could not successfully raise this defense. Therefore, the appellant contends the trial court erred in denying pre-trial discovery and production both of the substance analyzed by the State, and its technical reports. We agree.

## A.

Surprisingly, this Court has never dealt specifically with the issue of whether the defense is entitled, on timely demand, to be provided with a sample of the alleged controlled dangerous substance for use in an independent chemical analysis. However, we have held that a defendant charged with a homicide is entitled to a pre-trial examination of a death weapon and other physical evidence recovered at the scene of a crime. *Doakes v. District Court of Oklahoma County*, 447 P.2d 461 (Okl.Cr. 1968). We also have held that a defendant

C. Any substance which contains any quantity of methamphetamine, including its salts, *isomers,* and salts of *isomers.*

charged with exhibiting obscene movies is entitled to an inspection of the film. *Melton v. State*, 512 P.2d 204 (Okl.Cr.1973).

We note that many other jurisdictions have determined that refusal to furnish a defendant, who has been charged with possession of a controlled dangerous substance, with a sample of the alleged contraband, is error. *See, e.g., Jackson v. State*, 243 So.2d 396, 398 (Miss.1971) ("meaning of a " 'fair trial' requires that material, tangible evidence must not be concealed from the defendant who is accused of crime. There is no good reason why the defendant in a civil case should be entitled to more liberal right to tangible evidence in the possession of his adversary ... than is a person under a serious criminal charge"); *Patterson v. State*, 238 Ga. 204, 232 S.E.2d 233, 243 (1977) (where "acquittal is dependent upon the identification of the substances as contraband, due process of law requires that analysis of the substance not be left completely within the province of the state"); *Warren v. State*, 292 Ala. 71, 288 So.2d 826 (1973) (same); *State v. Smith*, 156 W.Va. 385, 193 S.E.2d 550 (1972) (defendant is entitled to be given an opportunity to examine contraband independently, as it may provide exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *See also People v. Taylor*, 54 Ill. App.3d 454, 369 N.E.2d 573, 12 Ill.Dec. 76 (1977); *State v. Migliore*, 261 La. 722, 260 So.2d 682 (1972).

■ The rationale used by these other jurisdictions would find support for a similar Oklahoma rule, under our prior precedent. We have said that "[p]rior to trial petitioner will be entitled to receive from the State any information that might tend to exculpate him or mitigate his punishment in the event of a conviction". *Stafford v. District Court of Oklahoma County*, 595 P.2d 797, 799 (Okl.Cr.1979). As noted by the West Virginia Supreme Court in *State v. Smith, supra*, a defendant charged with the illegal possession or sale

\* \* \* \* \* \*

[Emphasis added.]

of contraband "should [be] permitted to examine a sample, under proper supervision and control, since it might [be] shown that the alleged [contraband] was not illegal ..." *State v. Smith, supra* at 554. Judge Nix once noted, "[a] criminal trial is not a game of hide and seek. Disclosure of items in the possession of the State which would negate a defendant's guilt is dictated by fundamental fairness." *Stevenson v. State*, 486 P.2d 646, 650 (Okl.Cr.1971). We have long equated notions of fundamental fairness with due process of law under our State Constitution. *Cf. Jones v. State*, 610 P.2d 818 (Okl.Cr.1980) (although a defendant is not entitled to a perfect trial, he is entitled, as a matter of due process, to one that is fair). Finally, we note that in *Melton v. State, supra*, this Court determined that a person accused of exhibiting an obscene film was entitled to a pre-trial inspection of the file by an expert because "[i]n defending against this one narrow issue, expert testimony traditionally has played an important role in the defense of such charge." *Id.* at 205. Likewise, the identification of an alleged narcotic substance requires the services of an expert, and without the adequate assistance of an expert, an accused cannot successfully rebut the conclusions of the State. Therefore, we hold that due process considerations under Okla. Const. art. II, § 7 requires the State to afford the accused an opportunity to have his expert examine and test the samples of the substance which were actually examined by the State's experts. Of course, this rule does not extend to situations in which the sample is necessarily consumed in testing, nor does it forbid the trial court from placing conditions on the examination designed to adequately safeguard the integrity of the evidence.

We therefore hold the trial court erred in forbidding independent examination to this appellant.

■ We are cognizant of the fact that the prosecution offered the appellant certain random samples of the seized substance which was not tested by the State. The offering of random samples, not specifically tested by the State, provides the ap-

pellant with no reliable evidence for cross-examination, impeachment purposes, or for his case-in-chief. Therefore, this gesture by the State was insufficient to fulfill the discovery requirements set forth above.

### B.

■ The appellant also contends that it was error for the trial court to deny his request for discovery of scientific test results and reports relied upon by the prosecution. We agree. This Court has held that:

> In cases involving an intricate, specialized, report of a highly technical and scientific nature, supported by graphs, charts, pictures, and engineer's calculations. and computations couched in highly professional terminology, even-handed justice requires pretrial examination of such report where the same constitutes evidence of the matter charged. But this right does not permit unbridled inspection of the prosecutor's files; but only that matter which is in the nature of a highly technical report.

*Layman v. State*, 355 P.2d 444, 445 (Okl. Cr.1960). This rule contributes to the achievement of several important constitutional rights. The ability to survey the reports will allow defense counsel to realistically assess the case, and effectively exercise the defendant's right to confrontation by providing the defendant with access to information necessary to test the credibility of the witness. The report may suggest to the defense counsel the appropriate course of its defense, thus contributing to the defendant's ability to intelligently exercise the right of compulsory process. Finally, the rule contributes to the defendant's right to enter a knowing and intelligent plea of quilty. *See Commentary, ABA Standards for Criminal Justice*, § 11-2.1 It therefore was error to deny the request of appellant to view the technical reports in this case.

■ Our holding is consistent with the *ABA Standards*, which we previously have relied upon for authority. *See Stevenson v. State*, 486 P.2d at 650. Standard 11-2.1 provides:

(a) Upon the request of the defense, the prosecuting attorney shall disclose to defense counsel all of the material and information within the prosecutor's possession or control including but not limited to:

(iv) any reports or statements made by experts in connection with the particular case, including results of physical or mental examinations and of scientific tests, experiments or comparisons;

\* \* \* \* \* \*

We hereby adopt this standard as the appropriate standard for prosecutorial disclosure of such evidence.

The State contends that the data and reports fall within the "work product" privilege. We disagree. In regard to this privilege, this Court has held that:

The State's "work Product" shall include reports compiled by a law enforcement agency in the course of its investigation into a criminal offense and statements obtained by prosecuting attorneys and peace officers from various witnesses for the State, without regard to whether such statements and reports are later sought for the purpose of cross-examination or impeachment.

*State ex rel. Fallis v. Truesdell,* 493 P.2d 1134 (Okl.Cr.1972). More recently, this Court held that the work product privilege may not be applied to derogate a defendant's constitutional right to disclosure of favorable evidence, but that evidence must be material to either guilt or punishment before it is discoverable. *Nauni v. State,* 670 P.2d 126, 133 (Okl.Cr.1983). The denial by the trial court for the discovery of the data and reports was error since the report was material to the issue of the appellant's guilt or innocence.

■ The *ABA Standard* 11–2.6(a), furnishes a "work product" exemption as well. That standard provides:

Disclosure shall not be required of legal research or of records, correspondence, reports or memoranda to the extent that they contain the opinions, theories, or conclusions of the prosecuting attorney or members of the prosecutor's legal staff.

The commentary following this standard provides a two-fold test which aids in the determination of such work products. The first prong requires that the paper or document was prepared by the prosecuting attorney or a member of his legal staff. The second prong requires that the contents of the questioned paper be judgmental rather than factual. The commentary specifically suggests that medical, scientific, and expert reports are not work products since they are controlled by *ABA Standard* 11–2.1(a)(iv), *supra.* Applying this standard to the case at bar, we first note that the documents were not made by a member of the prosecutor's "legal" staff, but by a chemist employed by OSBI. Moreover, the documents were scientific in nature and should have been disclosed pursuant to *ABA Standard* 11–2.1(a)(iv), *supra.*

Finding merit to the appellant's assignment of error, we hereby REVERSE the judgment and sentence of the district court and REMAND this cause for a new trial consistent with the holdings herein.

BRETT, P.J., concurs in results.

BUSSEY, J., dissents.

BUSSEY, Judge, dissenting:

I must dissent to the reversal of this case. I am of the opinion that 63 O.S.1981, § 2–206(A)(4) is clear and unambiguous by its terms. I am not convinced that it is within the province of this Court to legislate an isometric derivative exception for cocaine into the statute where the statute clearly excludes, "coca leaves or extractions which do not contain cocaine or ecgonine."

Furthermore, the evidence of appellant's guilt is clear, convincing and cogent, and I am not persuaded the defense was deprived of any right to present evidence that the three ounces of the white powdery substance, which was sold for $6,600, was cough syrup or cold tablets, or that the State was required to resupply him with samples of the cocaine which he had illegally sold. I would affirm the judgment and sentence.