Sam GRAYSON, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 48A02–9110–CR–482.[1]

Court of Appeals of Indiana,
First District.

June 8, 1992.

1. This case transferred by direction of the Chief Judge on 4/3/92.

William D. McCarty, Anderson, for appellant-defendant.

Linley E. Pearson, Atty. Gen., Lisa M. Paunicka, Deputy Atty. Gen., Office of Atty. Gen., Indianapolis, for appellee-plaintiff.

BAKER, Judge.

A jury found defendant-appellant Sam Grayson guilty of dealing in cocaine, a Class B felony.[2] It also concluded Grayson was a habitual offender.[3] The trial court sentenced Grayson to ten years' imprisonment on the cocaine charge and enhanced the sentence by an additional 30 years because of Grayson's habitual offender status. Grayson appeals, raising the following issues for our consideration:

I. Whether the prosecution adduced sufficient evidence that the substance Grayson sold was a prohibited form of cocaine.

II. Whether Grayson received ineffective assistance of counsel.

III. Whether the trial court erred in refusing to allow the jury to rehear a portion of Grayson's testimony.

IV. Whether the prosecutor engaged in misconduct and thereby denied Grayson a fair trial.

2. IND.CODE 35-48-4-1(1).

3. IND.CODE 35-50-2-8.

V. Whether the trial court improperly denied Grayson credit for pretrial detention time.

We affirm and remand for a determination of pretrial detention credit.

## FACTS

The evidence most favorable to the verdict shows that in January of 1990 an individual approached the Anderson Police Department and offered his services as a confidential informant (the C.I.). The offer was accepted. Over the next eleven months the C.I. made between 30 and 35 controlled buys. Two of these involved Sam Grayson.

The first occurred on August 26, 1990. After being searched, given money, and wired with a concealed microphone, the C.I. went to the home of Gladys Woods and asked her if she had cocaine for sale. He entered her home and saw Grayson smoking cocaine. Grayson offered to sell 40 dollars' worth of the drug to the C.I., who accepted.

Three days later the C.I. again met with Anderson police officers, and was again searched, given money, and fitted with a concealed microphone. The C.I. met Grayson outside a local tavern and purchased 50 dollars' worth of cocaine from him.

On both occasions the C.I. turned the purchase over to the police who subsequently tested it and identified it as cocaine. Grayson was arrested and convicted by a jury for his participation in the August 29th transaction.

## DISCUSSION AND DECISION

### Sufficiency of the Evidence

■ Grayson claims the evidence failed to establish that the substance he sold was a prohibited form of cocaine. He relies on an elaborate strategy known as the "cocaine isomer defense." [4]

**4.** By far the most extensive analysis of the cocaine isomer defense appears in *Best v. State* (1989), 79 Md.App. 241, 556 A.2d 701, *cert. denied*, 317 Md. 70, 562 A.2d 718. According to *Best*, the defense first appeared in the Seventh Circuit in the 1976 case *United States v. Orzechowski* (7th Cir.1976), 547 F.2d 978, *cert. denied*, 431 U.S. 906, 97 S.Ct. 1701, 52 L.Ed.2d 391. Since then it has been called "clever and intellectually challenging," *Best, supra*, 79 Md.App. at 261, 556 A.2d at 711, "a sophisticated scientific defense," *United States v. Ross* (2nd Cir. 1983), 719 F.2d 615, 617, "technical," *Moore v. State* (1987), Okl.Cr., 740 P.2d 731, 732, and "ingenious," *Chappee v. Vose* (1st Cir.1988), 843 F.2d 25, 33, n. 6, as well as "meritless," *United States v. Fince* (4th Cir.1982), 670 F.2d 1356, 1358, *cert. denied*, 456 U.S. 982, 102 S.Ct. 2254, 72 L.Ed.2d 860, and "an exercise in futility, frequently working much mischief," *Best, supra*, 79 Md.App. at 277, 556 A.2d at 719.

An isomer is a compound having the same percentage composition and molecular weight as another compound but differing in chemical or physical properties. AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 694 (4th printing 1969). Like most organic compounds, cocaine has some isomers which, while having the same molecular formula, have different molecular structures. Based on these structural differences, cocaine is grouped into two broad classifications: the first, derived from the coca leaves themselves, is known as L-cocaine; the second, chemically synthesized, is known as D-cocaine. *Ross, supra; United States v. Francesco* (1st Cir.1984), 725 F.2d 817; *United States v. Scott* (4th Cir.1984), 725 F.2d 43; *Best,*

*supra; Moore, supra.* It seems to be universally accepted that there are eight isomers of cocaine. Of these, only one, L-cocaine, is derived from coca leaves; the other seven are all chemically synthesized in laboratories. *Ross, supra; United States v. Kolenda* (6th Cir.1983), 697 F.2d 149; *Schlobohm v. Rice* (1987), 157 Ill.App.3d 90, 109 Ill.Dec. 422, 510 N.E.2d 43; *Best, supra; State v. Thomas* (1989), 152 Vt. 315, 565 A.2d 1335. Both L-cocaine and D-cocaine share the same molecular formula and structure, except that they are reverse or mirror images of one another. *Best, supra,* 79 Md.App. at 267, 556 A.2d at 714. The only difference manifested between the respective mirror images is in "the direction a crystal [of the particular isomer] will rotate plane-polarized light passed through it." *United States v. Bockius* (5th Cir.1977), 564 F.2d 1193, n. 2.

A defendant employing the typical cocaine isomer defense contends that only the L-cocaine classification has been addressed by the governing statute. This is a plausible argument because at the time the defense originated, the federal statute, 21 U.S.C. § 812(c) (1976), and many state statutes modelled after it prohibited "coca leaves and any salt, compound, derivative, or preparation of coca leaves, and any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances...." Thus, the argument goes, the seven synthetic isomers, not being derivatives of the coca leaf, are regulated only if they are "chemically equivalent or identical with" the form that is derived from the coca leaf. The defendant then argues the prosecu-

When reviewing a challenge to the sufficiency of the evidence, we do not reweigh evidence or reassess the credibility of witnesses. *Byrd v. State* (1991), Ind.App., 579 N.E.2d 457, 465. We consider only that evidence favorable to the verdict, together with all reasonable and logical inferences derivable therefrom. *Id.* If there is substantial evidence of probative value, we will not disturb the verdict. *Id.*

The evidence here shows that Steven First, a chemist for the Anderson Police Department with nine years' experience, analyzed the substances Grayson sold to the C.I. He conducted five spot tests to determine the presence of major drug groups. He then submitted the sample to ultra-violet spectroscopy, gas chromatography, and infra-red spectrophotometry tests which positively identified the substance as cocaine. Officer Faust testified that the area in which the transaction occurred was a known drug area. The two prices the C.I. paid, $40 and $50 per rock of cocaine, comport to the drug's standard values. The C.I. testified he was a former cocaine user thoroughly familiar with the drug and knowledgeable about "how it was being sold, how it was coming in, who was doing it, who was using and who was selling."

tion must specifically prove that the substance in question is the L variety and not the D variety, or that the D variety is equivalent or identical to the L variety. A failure to do so is argued to be a fatal lack of proof. The "polarimeter" test, the "mixed melting point" test, and the "gold chloride microcrystalline" test are the only known methods to distinguish the two types of cocaine. *Best, supra,* 79 Md.App. at 267, 556 A.2d at 714.

The current Indiana statute tracks the federal one as the latter existed some time ago. IND. CODE 35–48–1–7 defines "cocaine" as follows: 'Cocaine' includes coca leaves and any salt, compound, or derivative of coca leaves, and any salt, compound, isomer, derivative, or preparation which is chemically equivalent or identical to any of these substances. However, decocainized coca leaves or extraction of coca leaves that do not contain cocaine or ecgonine are not included.

Grayson claims the prosecution failed to establish that the tests performed by the chemist distinguish the cocaine isomer which the legislature has proscribed (L-cocaine) from those which it has not (D-cocaine).

Grayson has waived his right to present the cocaine isomer defense on appeal because he presented no evidence whatsoever regarding it during his trial. But even if Grayson had attempted a cocaine isomer defense at trial, very likely he would not have succeeded. The defense has seen almost universal failure, and for good reason. We quote from *Best:*

> Our rejection of the cocaine isomer defense, however, is more broadly based. Several observations in that regard are pertinent. The most salient observation is that the defense is a product of the 'think tank' and not of the real world. We have discovered 13 federal cases, spanning nine of the judicial circuits, dealing with the cocaine isomer defense. In not one of them is there the remotest indication that any witness had ever found present any isomer other than the natural L-cocaine. There is no hint of any synthetic drug production intended to undercut the importation of natural cocaine from Latin America. The defense experts, including ubiquitous Dr. Robert Shapiro, a professor of chemistry at the University of Colorado, are never brought forward to conduct their own polarimeter (or other) test but only to testify, in the abstract, about the inadequacy of the tests run by the prosecution experts. . . .

> Not only has none of the cases ever suggested the actual presence of D-cocaine instead of L-cocaine but some of the authorities have expressed doubt even as to D-cocaine's existence. *United States v. Posey,* 647 F.2d 1048 (10th Cir.1981); *See also United States v. Scott,* 725 F.2d 43, 45, n. 4 (4th Cir.1984).

> \* \* \* \* \* \*

> The mischief of the cocaine isomer defense is obvious and manifest. If a court can be persuaded that there is a burden upon the prosecution to negate, in a vacuum, the existence of some phantom possibility that no one has actually seen, the prosecution might easily fail to prove a legally sufficient case. In the alternative, the judge might give, as is contended here, an inadequate jury instruction. If neither of these errors should occur, there would nonetheless remain the real possibility that the jury might be hopelessly confused by arcane complexities beyond its competence.

*Best* 79 Md.App. at 273–75, 556 A.2d at 717–18. The court then observed that "[t]he legislative response to the cocaine isomer defense has been just as disdainful as has the judicial response." *Id.* at 276, 556 A.2d at 718. 21 U.S.C. § 812(c) was amended in 1984 "to afford the isomer strategy a decent burial." *Chappee, supra,* at 33, n. 6. In the end, the *Best* court soundly held "that to generate a genuine jury issue ... does not mean simply raising the theoretical possibility of such a substance [as D-cocaine]. It requires some evidence that the nontraditional isomer is actually present in a given case." *Best, supra,* 79 Md.App. at 278, 556 A.2d at 719. Although we have no occasion to so hold, we thoroughly agree with the reasoning and outcome of *Best.*

*Record* at 209. He testified Grayson sold him cocaine. Based on this evidence, the jury obviously could reasonably conclude the substance Grayson sold the C.I. was cocaine. There was sufficient evidence adduced to warrant a finding that the substance Grayson sold was cocaine.

The claim that the prosecution failed to prove the substance possessed or sold was a prohibited form of cocaine has repeatedly failed. "Although the government has the burden ... of proving every element of the offense charged, it has no burden of proving that a term used in its commonly understood sense has no other possible meaning—at least until the possibility of another meaning is raised by the defense." *United States v. Puglisi* (2nd Cir.1986), 790 F.2d 240, 242, *cert. denied,* 479 U.S. 827, 107 S.Ct. 106, 93 L.Ed.2d 55 (citing *United States v. Francesco, supra,* at 821). *See also Schlobohm, supra,* 157 Ill.App.3d at 95, 109 Ill.Dec. at 425, 510 N.E.2d at 46 (no requirement that police board isometrically identify cocaine ingested by police officer as L-cocaine), and *Thomas, supra,* 565 A.2d at 1337 (when defendant fails to build evidentiary base for cocaine isomer defense the prosecution is not required to prove which isomer was found in the defendant's possession). Grayson's sufficiency of the evidence claim fails.[5]

### Ineffective Assistance

Grayson next contends he was denied his Sixth Amendment right to effective assistance of counsel.

We review ineffective assistance of counsel claims under the two-step process first articulated in *Strickland v. Washington*

(1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. Under this test, we first look to see whether counsel's performance was deficient; a strong presumption exists, however, that it was not. If we do find counsel's performance to be outside the wide range of professional competence, we then look to see whether the defense was prejudiced by the deficient performance. *Id.* We will not speculate about what may have been a more advantageous strategy, and isolated bad tactics or inexperience do not necessarily amount to ineffective assistance. *Gann v. State* (1991), Ind.App., 570 N.E.2d 976, 978, *trans. denied; Berry v. State* (1990), Ind.App., 561 N.E.2d 832, 839.

■ Grayson bases his ineffective assistance claim on his trial counsel's failure to object to the absence of foundation supporting the chemist's testimony. At trial, however, Gray defended himself by claiming he was not present for the first buy, and although he was in the general locale of the second sale, he was not the one who sold the substance to the C.I. Grayson did not claim the substance the C.I. purchased was not cocaine.

The choice of defenses is a matter of trial strategy. We will not fault trial counsel for refusing to argue that Grayson was not the individual who sold the cocaine to the C.I., but if it was Grayson who sold it, the substance wasn't cocaine. Grayson was much more likely to prevail using a defense that claimed either he was not the seller or the substance was not cocaine. Trial counsel reasonably chose the former as a matter of strategy. We refuse the

---

5. Even if Grayson had properly raised the issue of whether the substance he sold was a prohibited form of cocaine, the jury would still have been justified in concluding both that the substance was cocaine and that it was a prohibited form. Whether the substance in question is within the statutory prohibition is an issue for the jury to resolve, *Scott, supra,* at 45, *Francesco, supra,* at 821, and evidence on the issue may come in the form of lay testimony and circumstantial evidence. In *United States v. Gregorio* (4th Cir.1974), 497 F.2d 1253, 1263, *cert. denied,* 419 U.S. 1024, 95 S.Ct. 501, 42 L.Ed.2d 298, the court, noting "no samples were admitted into evidence, no samples were subject to chemical analysis, and there was no expert testimony

from medically or scientifically trained persons," relied on lay testimony to establish that "the white, powdery, crystalline substance" in that case qualified as a prohibited controlled substance. In *United States v. Dolan* (4th Cir. 1976), 544 F.2d 1219, 1221, the court wrote "lay testimony and circumstantial evidence may be sufficient, without the introduction of an expert chemical analysis, to establish the identity of the substance involved in an alleged narcotics transaction." The courts in *Scott, supra,* at 45, and *United States v. Hall* (9th Cir.1977), 552 F.2d 273, 276, reached the same conclusion. As demonstrated momentarily, the lay testimony and circumstantial evidence against Grayson in this regard is ample.

invitation to speculate that the latter may have been more fruitful. We note any objection to a lack of foundation concerning the chemist's testing procedures would only have called added attention to the nature of the drug and would have been easily rectified by a preliminary question. The choice to downplay the identification of the substance was a reasonable tactic which we will not second guess. Grayson's trial counsel was not ineffective for failing to object to the lack of foundation preceding the chemist's testimony.

### Prosecutorial Misconduct

Grayson argues the prosecution committed misconduct by asking certain questions during Grayson's cross-examination, depriving him of a fair trial. Specifically, Grayson directs our attention to the following exchange:

Q: ... There is some lady from Muncie named Miss Flo had sent word to the fellows in the Madison County Detention Center who were charged as a result of work done by C.I. # 8921 that if they were to hold out and not plead guilty then she would make everything all right for them?

A: I have never heard of nothing like that. No I haven't.

Q: Did you not hear that the word also included a message that if you held out and forced # 8921 to be identified that he would be taken care of?

A: No I haven't heard that. I don't even know a Miss Flo. I haven't heard none of that.

Q: Is it true that you held out and refused to plead to force the identification of C.I. # 8921?

A: No it is not, no it is not. I did that because I am not guilty.

*Record* at 505–06. Grayson argues the prosecutor's questions denied him a fair trial by suggesting he went to trial solely to reveal the identity of C.I. # 8921 so that the C.I. would be "taken care of," i.e., killed.

 We note initially that because no objection was made to the prosecutor's questions the issue has been waived on appeal. *Haynes v. State* (1980), Ind.App., 411 N.E.2d 659, 665–66. Notwithstanding the waiver, Grayson is not entitled to reversal on this issue, because he has failed to show prejudice stemming from the prosecutor's misconduct.

"A prosecutor must have a reasonable basis for asking a question designed to impeach a witness on collateral matters." *Id.* at 665. Improper matters cannot be introduced by means of a question that contains an unsubstantiated assertion of fact. *Id.* Here, the state concedes there was no reasonable basis for the prosecutor's questions about Grayson's motive in proceeding to trial. The state is correct in asserting the error is harmless, however.

Errors which do not affect the substantial rights of the parties are to be disregarded. Ind.Trial Rule 61. In other words, Grayson must demonstrate a resultant prejudice. *Telfare v. State* (1975), 163 Ind.App. 413, 324 N.E.2d 270. This he has not done. The issue at trial was whether Grayson sold cocaine to the C.I., not Grayson's motive to testify. After reviewing the record as a whole to determine the probable impact the improper questioning had on the jury, we conclude beyond a reasonable doubt the error did not influence the verdict. *See McCoy v. State* (1991), Ind.App., 574 N.E.2d 304, 307 (the less material the issue, the less likely it taints a jury's decision). Because Grayson has not shown a prejudice arising from the improper questions, the error is harmless.

### Jury's Request to Rehear Testimony

During deliberations the jury sent a note to the trial court saying, "We need to review Mr. Grayson's testimony from his lawyer." The trial court interpreted this to mean the jury wished to review Grayson's direct examination, then said:

... I am satisfied that I am allowed to [replay portions of testimony] if they ... if there is a point that they want cleared up. We can let them hear that much, but they want it all and there is a lot of stuff in there. Some of it inadmissible, but there was no objection so it is in there. I am hesitant to allow. I am hesitant to do that. My remark was,

that unless you two gentleman agree that they can hear the entire direct examination, I am not going to do it. Now if they write me another note and say, "we need ... we are confused on this point, we need it cleared up" then that is something else. My thinking is that just to have all the entire direct examination played is inappropriate.

*Record* at 614–15. Grayson argues the trial court's decision was contrary to law inasmuch as Grayson's testimony was short (22 pages), the trial court effectively ceded the decision to the prosecution by requiring an agreement between the two sides, and because the trial court failed to ask the jurors if there was some particular area about which they disagreed.

■ IND.CODE 34–1–21–6 governs the replaying of trial testimony for the jury. It provides that

> After the jury have retired for deliberation, if there is a disagreement between them as to any part of the testimony, or if they desire to be informed as to any point of law arising in the case, they may request the officer to conduct them into court, where the information required shall be given in the presence of, or after notice to, the parties or their attorneys.

IND.CODE 34–1–21–6 does not always require the testimony to be replayed, however. Unless the jury manifests disagreement about the testimony or seeks clarification on legal issues, the trial court is under no duty to respond to the jury's request. *Smith v. State* (1979), 270 Ind. 579, 388 N.E.2d 484.

■ When IND.CODE 34–1–21–6 is inapplicable, the decision to replay testimony lies within the sound discretion of the trial court. *Smith, supra; Brinegar v. Robertson Corp.* (1990), Ind.App., 550 N.E.2d 812, *trans. denied.* The failure to give the jury

the requested information is not reversible error per se. *Id.; Brinegar, supra.* Here, the note from the jury did not indicate any disagreement, nor did it ask to be informed on any point of law. It simply asked to hear Grayson's direct examination again. Thus, the statute is inapplicable.

The trial court recognized the inapplicability of the statute by explicitly observing the situation would be different if the jury indicated confusion. It considered the arguments both sides put forth and, in its discretion, chose to refuse the jury's request. We refuse Grayson's implicit request to require trial courts to question juries about whether they are in disagreement when there is no indication they are. Neither are we persuaded by Grayson's argument that the trial court gave the prosecution a veto power by requiring agreement. The record clearly indicates the trial court decided the issue before making the "unless you two gentlemen agree" remark. The trial court did not abuse its discretion.

### Pretrial Detention Credit

■ Finally, Grayson contends the trial court erroneously gave him no credit for the jail time he served awaiting trial. Because we cannot determine whether the trial court erred in failing to give Grayson pretrial detention credit, we remand the issue for further proceedings.

It appears from the record that at the time Grayson was arrested for his present crimes he was on probation for a previous conviction from another court. *Record* at 71, 762. Evidently the trial court, not knowing whether Grayson's probation had been revoked as a result of Grayson's commission of the instant crimes, declined to give Grayson pretrial detention credit out of a concern that Grayson not be allowed double credit.[6]

6. Under IND.CODE 35–50–1–2, if, after being arrested for one crime, a person commits another crime before the date the person is discharged from probation for the first crime, then the terms of imprisonment for the crimes must be served consecutively. Thus, if Grayson's probation is revoked and he is ordered to serve time as a result of that revocation, Grayson must serve that time consecutively to the sen-

tence he has just received for dealing in cocaine and being an habitual offender.

Further, case law establishes that a defendant given consecutive sentences is entitled to credit against only the aggregate sentence, not against each individual sentence. *Lanham v. State* (1989), Ind.App., 540 N.E.2d 612, *trans. denied; Simms v. State* (1981), Ind.App., 421 N.E.2d 698. Thus, if his probation is revoked and Grayson is

We lack the necessary information to make a determination on this issue. Grayson is entitled to the credit; the trial court must determine if he has received it and act accordingly. We remand to the trial court with instructions to make the appropriate determinations in a manner consistent with this opinion.

Affirmed and remanded.

CHEZEM, J., concurs.

SULLIVAN, J., concurs in part and dissents in part with separate opinion.

SULLIVAN, Judge, concurring in part and dissenting in part.

With reference to the allegation of prosecutorial misconduct, I agree that Grayson waived the error inherent in the questions as to whether he was a participant in a scheme to have the confidential informant assassinated. I do not, however, agree that such inquiry could not have had impact upon the jury verdict. The cocaine dealing charge could not have been proved without evidence of the participation of the confidential informant. The implication given to the jury was that if Grayson "held out" and did not plead guilty, "Miss Flo" would have the informant "taken care of". Such implication might well carry with it an inference that Grayson was guilty of the crime in which the informant was the only other participant, and the crucial witness. Accordingly, I would not categorize the error as harmless; but neither would I say that it was fundamental error so as to require sua sponte reversal.

I dissent from that portion of the opinion which would permit the trial court to grant or deny credit for jail time dependent upon whether Grayson has already received credit for that period of time as a result of a probation revocation proceeding in a different court.

The majority correctly states that under I.C. 35-50-1-2 the sentence imposed as a result of a probation revocation and the sentence imposed in the instant case must be served consecutively. However, the crediting of jail time against the instant sentence is not affected by whether or not this sentence will be served consecutively to a sentence imposed as a result of probation revocation. To be sure, Grayson may not be entitled to have jail time credit given against each of the consecutive sentences. That does not mean that any particular court, in determining entitlement to jail-time credit, must consider other possible convictions, sentences or charges involved in other courts or other jurisdictions.

We have many times stated that consecutive sentencing is a concern for the particular court only when *that* court is imposing sentences upon multiple convictions. *See Kendrick v. State* (1988) Ind., 529 N.E.2d 1311. With reference to jail-time credit, the two cases cited by the majority in footnote 5 are in keeping with *Kendrick*. In both *Lanham v. State* (1989) 1st Dist.Ind. App., 540 N.E.2d 612, *trans. denied,* and *Simms v. State* (1981) 4th Dist. Ind.App., 421 N.E.2d 698, the jail time credit was being assessed with reference to two sentences imposed upon multiple convictions in the same court. In those cases it was therefore appropriate for the court to order credit against the aggregate of the two sentences. It is not appropriate for the Madison Circuit Court to attempt to do so here in consideration of a sentence which may or may not have been imposed as a result of a probation revocation in a different court.

The circumstance before us is more closely akin to the consecutive sentence issue as considered in *Kendrick v. State, supra,* and myriad other cases. *See Arnold v. State* (1989) 2d Dist. Ind.App., 539

---

ordered to serve time as a result, he is entitled only to pretrial detention credit as applied against the aggregate of his sentence arising from his revocation and his current sentences; he is not permitted to "double dip" by receiving credit applied against each of the individual sentences. If Grayson serves time as a result of a revocation but is given no pretrial detention

credit, then the trial court must give Grayson the credit for the time he served, because Grayson is entitled to his one dip. In other words, if both courts impose sentences, one court, but not both, must give Grayson the pretrial credit he has earned. If Grayson's probation is not revoked, he is still, of course, entitled to credit for time served.

N.E.2d 969, *trans. denied,* and cases there cited. We have held that the details of orchestrating the service of consecutive sentences from different courts is a matter of administrative prerogative for the Department of Correction. *Arnold v. State,* supra. *See also Propes v. State* (1992) Ind., 587 N.E.2d 1291; *Terry v. Byers* (1903) 161 Ind. 360, 68 N.E. 596. The matter of when a particular period of incarceration should terminate in consideration of jail-time credit while awaiting trial, as well as in consideration of good-time credit during the incarceration pursuant to sentence, should rest within the function of the Department of Correction.[7] Accordingly, I would remand with instructions to give Grayson credit for the number of days spent in jail awaiting trial upon the instant charge and would leave the matter of an actual release date to the proper functioning of the Department of Correction.

In all other respects I concur.

---

**7.** It is worthy of note in this regard that the General Assembly included jail-time credit for pre-trial confinement within the very provision which awards good-time credit during penal incarceration and which can only be computed and awarded by the Department of Correction. It would thus appear that legislative design vests the same entity with the responsibility to apply the statute in each instance.