**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Martin ROSS, Defendant-Appellant.**

**No. 1093, Docket 82–1441.**

United States Court of Appeals,
Second Circuit.

Argued April 19, 1983.

Decided Oct. 13, 1983.

David Liebov, Sp. Asst. U.S. Atty., S.D. N.Y., New York City (John S. Martin, Jr., U.S. Atty., S.D.N.Y., Walter P. Loughlin, Asst. U.S. Atty., New York City, of counsel), for plaintiff-appellee.

Jay Goldberg, New York City (Sheryl Reich, New York City, of counsel), for defendant-appellant.

Before FRIENDLY, WINTER and PRATT, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

Martin Ross appeals from his conviction in the United States District Court for the Southern District of New York on a single misdemeanor count of possessing 1/80 of an ounce of cocaine in violation of 21 U.S.C. § 844 (1976). He was fined $2,500 and given a split sentence requiring him to serve two months in prison and three years on probation.

Ross argues that the district judge erred in instructing the jury that D-cocaine is the chemical equivalent of L-cocaine, in instructing the jury on reasonable doubt, and in refusing to give an instruction pursuant to 18 U.S.C. § 3501 as to the voluntariness of a statement Ross made to federal agents. Ross also claims error in the denial of his pre-trial motions to dismiss the indictment on the ground of selective prosecution and

to suppress non-verbal "statements" claimed to have been elicited in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). While we find no reversible error in the other claims, we agree that the trial judge erroneously instructed the jury as to the chemical equivalency of L-cocaine and D-cocaine, and therefore reverse the conviction and remand for a new trial.

## FACTS

On June 17, 1982 more than 20 agents of the Internal Revenue Service entered Marty's Restaurant in Manhattan to execute a search warrant issued as part of an IRS investigation into the skimming of income by owners of New York City restaurants. The warrant authorized seizure of "records and documents of Marty's Restaurant which are evidence and instrumentalities of the crimes of evading individual income taxes due and owing to the United States * * *." The agents found Ross, the record owner of Marty's, in the restaurant's business office on the second floor. After Ross read the warrant, agent Doyle explained that Ross was not under arrest and was free to remain at the restaurant or to leave, but if he remained during the search he would be accompanied at all times by an IRS agent.

Ross did not ask to leave. He requested and was given permission to telephone his lawyer, who was unavailable. Refusing to delay the search until Ross's lawyer would be available, agent Doyle began by asking whether Ross had any weapons or large amounts of cash on the premises. Ross first replied that he did not, and then he asked the agents whether they could seize items not specifically included in the warrant. Rather than responding directly, agent Hoffman asked if Ross was worried about drugs, whereupon Ross nodded affirmatively and gestured in the direction of the right-hand drawer of his desk. Agent Hoffman opened the drawer, found cocaine and drug paraphernalia, and seized them. Ross was not arrested immediately, nor was he given *Miranda* warnings. The agents

proceeded to execute the search warrant and seized 71 cartons of business records. Four weeks later, and despite Ross's prior indication that he would voluntarily surrender if requested, Ross was arrested in the bedroom of his home and charged with a single count of possession of cocaine, on which he was convicted after trial. This appeal focuses primarily on the court's charge to the jury.

## CHARGE ON COCAINE ISOMERS

The first issue we consider arises out of the so-called "cocaine isomer strategy", *United States v. Ortiz,* 610 F.2d 280, 281 (5th Cir.), *cert. denied,* 445 U.S. 930, 100 S.Ct. 1320, 63 L.Ed.2d 764 (1980); *United States v. Bockius,* 564 F.2d 1193 (5th Cir. 1977), a sophisticated scientific defense grounded in the chemistry of cocaine, which has been frequently asserted in other circuits, *e.g., Ortiz, supra; United States v. Luschen,* 614 F.2d 1164 (8th Cir.), *cert. denied,* 446 U.S. 939, 100 S.Ct. 2161, 64 L.Ed.2d 793 (1980); *Bockius, supra; United States v. Hall,* 552 F.2d 273 (9th Cir.1977); *United States v. Wilburn,* 549 F.2d 734 (10th Cir.1977); *United States v. Umentum,* 547 F.2d 987 (7th Cir.1976), *cert. denied,* 430 U.S. 983, 97 S.Ct. 1677, 52 L.Ed.2d 376 (1977); *United States v. Orzechowski,* 547 F.2d 978 (7th Cir.), *cert. denied,* 431 U.S. 906, 97 S.Ct. 1701, 52 L.Ed.2d 391 (1977), but never before in this circuit. This strategy, extensively described in *Bockius,* 564 F.2d at 1194–1196, has its roots in the definitions set forth in Schedule II (a)(4) of 21 U.S.C. § 812(c) (1976). There, a "controlled substance" is defined to include:

> Coca leaves and any salt, compound, derivative, or preparation of coca leaves, and any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances * * *.

As explained in the cases cited above, and as confirmed essentially by the testimony of the government's expert at trial, cocaine has eight isomers, only one of which, L-cocaine, is a derivative of the coca leaf. Since the other seven isomers are synthetic, they

are "controlled" by the statute only if they are "chemically equivalent or identical with" L-cocaine. The burden was therefore on the government to prove at trial that the substance Ross possessed was either L-cocaine, or that it was chemically equivalent or identical to L-cocaine.

To meet that burden the government called a DEA chemist, Frederick Martorell, who testified on direct examination that he had performed a Marquis test, a cobalt thiocyanate test, a thin-layer chromatography test, a mass spectroscopy test, and a gas-liquid chromatography test. From these five tests he concluded that the substance seized from Ross's desk drawer was cocaine hydrochloride of extremely high quality. He did not, however, attempt on direct examination to distinguish among the various isomers of cocaine.

The cross-examination of Martorell raised serious questions of fact and credibility. Initially Martorell said that there were only two isomers of cocaine. When pressed, however, he conceded that there were eight. He further testified that the L-cocaine is the illegal cocaine and the only one of the eight cocaine isomers covered under the federal statute. Nowhere did he explain that any of the other isomers could be "illegal cocaine" if they were chemically equivalent to or identical with L-cocaine, nor did he nor any other witness testify as to the chemical equivalency or identity of D-cocaine and L-cocaine. Martorell did testify, however, that a polarimeter test would distinguish between D-cocaine and L-cocaine, and that absent the polarimeter test, one cannot tell whether it was D-cocaine or L-cocaine.

Despite his direct testimony about five tests, Martorell remembered on cross that he had performed a sixth test, the polarimeter test. That test, he said, showed the substance found in Ross's desk to be L-cocaine. He conceded that his laboratory notes did not indicate he had performed the test, and he admitted he could not remember actually having done so. He testified that the test was standard procedure and was always the last test he did. The reason he made no note about it was that "it probably slipped my mind."

On the evidence, the jury could reasonably have determined that the substance was either L-cocaine or D-cocaine. And if it was D-cocaine, an acquittal was mandated because no evidence had been offered to prove that the synthetic D-cocaine was "chemically equivalent or identical with" the natural substance, L-cocaine. The jury could properly convict on this record only if it found the substance tested to be L-cocaine, and the court should have so charged. In instructing the jury, however, the court stated that D-cocaine "is the chemical equivalent or identical to L-cocaine." This was error, because it permitted the jury to convict even if it found the substance tested to be D-cocaine. Defendant is therefore entitled to reversal and a new trial. Because there may be a new trial, we discuss briefly other issues raised by defendant.

## CHARGE ON VOLUNTARINESS

Ross argues that the trial court was required by 18 U.S.C. § 3501 (1976) to instruct the jury on the weight to be given to the gesture and nod he made in response to an agent's question about drugs. 18 U.S.C. § 3501(a) in pertinent part provides:

> If the trial judge determines that the confession was voluntarily made it shall be admitted in evidence and the trial judge shall permit the jury to hear relevant evidence on the issue of voluntariness and shall instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances.

The district court denied Ross's request to charge on this point on the ground that the voluntariness question had not sufficiently been raised at the trial. In fact, however, it *was* raised—by pre-trial motion, by a request to charge submitted in advance of trial, and by questions on cross-examination of the IRS agents as to the circumstances surrounding Ross's nod and gesture.

In *United States v. Barry*, 518 F.2d 342, 346 (2d Cir.1975), we commented that

"[i]t would be difficult to imagine a clearer imperative than the statutory direction that the judge '*shall* instruct the jury' " (emphasis in original). True, some cases after *Barry* have upheld a failure to give a § 3501 instruction when the defendant did not request the charge and denied making any incriminating statement, or when there was little, if any, evidence from which a jury could infer that the statement was involuntary. *United States v. Lewis,* 565 F.2d 1248, 1253 (2d Cir.1977), *cert. denied,* 435 U.S. 973, 98 S.Ct. 1618, 56 L.Ed.2d 66 (1978); *United States v. Fuentes,* 563 F.2d 527, 535 (2d Cir.), *cert. denied, Sansone v. United States,* 434 U.S. 959, 98 S.Ct. 491, 54 L.Ed.2d 320 (1977); *United States v. Diop,* 546 F.2d 484, 486–87 (2d Cir.1976); *United States v. Lucchetti,* 533 F.2d 28, 40 (2d Cir.), *cert. denied,* 429 U.S. 849, 97 S.Ct. 136, 50 L.Ed.2d 122 (1976). However, since Ross specifically requested a § 3501 instruction, and since he raised the voluntariness issue both in a pre-trial motion and through evidence developed on cross-examination of the government's witnesses, *see United States v. Lucchetti,* 533 F.2d at 40, we think it was error for the trial judge to refuse to charge the jury that it could give to the evidence about the nod and gesture such weight as the jury felt it deserved under the circumstances. While the error was probably harmless when viewed in the context of the entire charge and the evidence, we need not examine the question because a new trial is required in any event.

## SELECTIVE PROSECUTION

Ross complains that the district court abused its discretion by refusing to hold an evidentiary hearing on his motion to dismiss for selective prosecution. The United States Attorney's information charged Ross with possession of 360 milligrams of cocaine—approximately 1/80 of an ounce. Ross asserted by affidavit that there is a DEA and Department of Justice policy not to prosecute such small "personal use" quantities of narcotics, and that he was singled out for prosecution because he refused to "become an undercover informant/agent [for the IRS and FBI] and thereafter enter the Federal Witness Protection Program." He further asserted that he was threatened by an assistant United States attorney that if he did not cooperate with the government he would not only be prosecuted for the cocaine violation but he would also be "jailed again and again", with each arrest planned to maximize his time in jail. The district court denied Ross's motion without a hearing.

In *United States v. Berrios,* 501 F.2d 1207, 1211 (2d Cir.1974), we held:

To support a defense of selective or discriminatory prosecution, a defendant bears the heavy burden of establishing, at least *prima facie,* (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights.

Moreover, as we recently noted in *United States v. Moon,* 718 F.2d 1210 at 1230 (2d Cir.1983):

[T]o engage in a collateral inquiry respecting prosecutorial motive, there must be more than mere suspicion or surmise. If a judicial inquiry into the government's motive for prosecuting could be launched without an adequate factual showing of impropriety, it would lead far too frequently to judicial intrusion on the power of the executive branch to make prosecutorial decisions. Unwarranted judicial inquiries would also undermine the strong public policy that resolution of criminal cases not be unduly delayed by litigation over collateral matters.

To meet the first element of the *Berrios* test, Ross's counsel submitted an affidavit stating that the DEA has a policy "not to enforce the Drug laws with respect to personal use quantities," and that an attorney at the Department of Justice had stated

there were "zero prosecutions" for such offenses. While the government now claims that it was prepared to submit proof showing that there have been at least ten such prosecutions in the Southern District within the last three years, the district court denied the motion without requiring the government to respond. For purposes of this appeal, therefore, we assume the truth of the affidavits' allegations and conclude that Ross made a *prima facie* showing that he was singled out for prosecution.

As to the second element of the *Berrios* test, however, Ross has not established by affidavit or otherwise that his prosecution was invidious or in bad faith. "[T]he conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation." *Oyler v. Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962). Absent proof that the prosecutor's selection was based on grounds generally forbidden to government such as race, religion, or the exercise of a constitutionally protected right, constitutional principles of separation of powers restrict judicial inquiry into prosecutorial motive.

> Few subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding when and whether to institute criminal proceedings, or what precise charge shall be made, or whether to dismiss a proceeding once brought.

*United States v. Berrigan,* 482 F.2d 171, 180 (3rd Cir.1973), *quoting Newman v. United States,* 382 F.2d 479, 480 (D.C.Cir.1967).

Ross does not claim that he was selected for prosecution because of his race or religion. He does not even claim he was prosecuted because of an affirmative exercise of some constitutionally protected right, *see United States v. Falk,* 479 F.2d 616 (7th Cir.1973) (*en banc*); *United States v. Crowthers,* 456 F.2d 1074 (4th Cir.1972) (exercise of first amendment rights). His claim of bad faith motivation is that he was prosecuted because he declined to aid the government's investigation of offenses unrelated to his possession of cocaine. We do not find this to be a constitutionally objectionable motivation. Where there is probable cause for believing a defendant has committed a crime, his prosecution is not constitutionally barred because the prosecutor's selection of his, out of many other possible crimes to pursue, was precipitated by defendant's failure to cooperate with law enforcement officials.

Nor do we find a constitutional barrier to prosecution in Ross's additional claim, which we also assume *arguendo* to be true, that the prosecutor threatened to harass him with multiple arrests timed to produce maximum inconvenience and inevitable periods of detention. We do not pass on whether other remedies might be available for such a course of conduct had it actually occurred. We do note, however, that Ross complains of a threat, not an actuality. Indeed, although Ross ignored the threat, there is no suggestion that he was actually subjected to multiple harassing arrests.

Ross's reliance on *Angola v. Civiletti,* 666 F.2d 1 (2d Cir.1981), to support his claim that he has a constitutional right "against being coerced into cooperating with law enforcement authorities by governmental techniques of intimidation and harassment" is misplaced. In *Angola,* a civil rights action, the remedies sought were a declaratory judgment and an injunction against conduct of FBI agents who, by tactics of intimidation and harassment, allegedly infringed plaintiff's right not to be coerced into cooperating with law enforcement efforts. Here, Ross seeks not an injunction ending government efforts to coerce his cooperation, nor even damages for past infringements of his constitutional rights. Instead, he seeks dismissal of a criminal charge that is solidly supported by probable cause.

Moreover, the coercive, harassing tactics claimed to have been used against Angola and her friends included such things as repeated slashings of their automobile tires and illegally breaking into their apartments, and nothing Ross claims here remotely resembles such conduct. What Ross complains of is that he was told he could avoid prosecution by cooperating with the government agents. When he did not coop-

erate, the subsequent events involved no more than the purely discretionary—and lawful—prosecutorial acts of filing an information and causing his arrest pursuant to a valid warrant.

██ In short, the allegations of Ross and his attorney, even if true, were insufficient to establish a defense of selective prosecution. Consequently, the trial court did not abuse its discretion by denying Ross's selective prosecution claim without a hearing.

## CHARGE ON REASONABLE DOUBT

Ross next objects to that part of the court's instruction on reasonable doubt that said,

> You should return a guilty verdict if, but only if, you find the evidence so convincing that an ordinary person would not hesitate to rely and act on that in the most important of his or her own affairs.

██ Ross argues that this statement should have been "balanced" with language focusing on what would cause a juror to hesitate to act. It is true that the charge given differs from the one recommended in 1 Devitt & Blackmar, *Federal Jury Practice and Instructions* § 11.14 (3d ed. 1977) because it used the "hesitate to act" language only negatively, rather than both negatively and affirmatively; nevertheless, we find no error in the charge as given. In context it accurately expresses the concept of reasonable doubt, and is free of the potential for misunderstanding and confusion that was implicit, for example, in the elaborations on reasonable doubt used by the trial judge in *United States v. Ivic,* 700 F.2d 51, 68–69 (2d Cir.1983). Moreover, the charge as given closely parallels the pattern jury instruction on reasonable doubt prepared by the District Judges' Association of the Fifth Circuit, which affirmatively describes proof beyond a reasonable doubt as proof "of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own affairs." Fifth Circuit Pattern Jury Instructions 6 (Criminal Cases) (1979). Like the charge below, that pattern instruction does not include an additional, negative

statement that defines reasonable doubt as doubt that would "make a reasonable person hesitate to act". On this point, therefore, we find no error.

We do note in passing, however, that there is a clear error in the charge as recorded in the transcript, but because it is not raised by defense counsel we assume that the transcript is erroneous and does not accurately reflect the judge's actual instruction. According to the transcript, the trial judge instructed the jury that they need not find proof "beyond all *reasonable* doubt". The standard instruction used by many judges as a model reads "beyond all *possible* doubt". *See* 1 Devitt & Blackmar, *Federal Jury Practice and Instructions* § 11.14 (3d ed. 1977); Fifth Circuit Pattern Jury Instructions 6 (Criminal Cases) (1979). If actually given as transcribed, the error might be serious, but a new trial is required in any event, so we give no further attention to the matter.

## SUPPRESSION MOTION

Ross also claims error in the denial of his pre-trial motion to suppress evidence of his nod and gesture. This argument turns on whether the statement—the nod and gesture—was made in the course of a custodial interrogation. The district court found that it was not, so we must determine whether that finding was clearly erroneous. *See United States v. Gaines,* 563 F.2d 1352, 1359 (9th Cir.1977); *United States v. Planche,* 525 F.2d 899, 900 (5th Cir.1976).

In *Miranda v. Arizona,* 384 U.S. 436, 444, 82 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966), the Supreme Court held:

> [T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By *custodial interrogation,* we mean questioning initiated by law enforcement officers *after a person has been taken into custody or otherwise deprived of his freedom of action in any*

*significant way.* (emphasis added and footnote omitted).

It is undisputed that no *Miranda* warning had been given when Ross nodded and gestured toward the cocaine, and that previously the agents had told Ross he was free to leave the premises. Ross argues, however, that his "freedom of action" was nevertheless significantly restricted because he was told that if he chose to remain in his restaurant, he would be accompanied at all times by an IRS agent. He also claims that the agent's question about drugs was reasonably likely to elicit an incriminating response, and that under *Miranda* and *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), this constituted interrogation of a person whose freedom of action had been significantly affected.

■ After hearing the evidence on Ross's motion to suppress, the district court found that Ross "was free to leave the premises at all times" and was not in custody; consequently, the court denied the motion. The mere fact that Ross was told he would be accompanied by an IRS agent when he moved about the restaurant did not place him in custody within the meaning of *Miranda,* and it would be frivolous to suggest that the circumstances or manner of the inquiry actually overpowered Ross's will. We conclude that the district court's finding was not clearly erroneous, and its denial of the motion to suppress was proper.

Reversed and remanded. The mandate shall issue forthwith.

FRIENDLY, Circuit Judge, concurring and dissenting:

I join in all of Judge Pratt's opinion except the portion upholding the failure to hold a hearing on the issue of selective prosecution. I would direct that an evidentiary hearing be held on the remand.

Although the majority rightly assumes for purposes of this appeal that persons in Ross' situation are not generally prosecuted and that Ross has thus satisfied the first requirement of *United States v. Berrios,*

501 F.2d 1207, 1211 (2 Cir.1974), recently reaffirmed in *United States v. Sun Myung Moon,* 718 F.2d 1210 at 1230 (2 Cir.1983), it is worth pointing out how disingenuous the Government was in its handling of this issue both before the district court and here. In its brief in this court, it characterized Ross' assertion as being that "the offense of *simple possession* is never prosecuted in the Southern District of New York" (emphasis supplied), and its offer of proof in the district court related to "at least ten other cases in which the crime of *possession of a controlled substance* has been prosecuted in this district in the past three years." (Emphasis supplied) (footnote omitted). However, Ross' contention about general non-prosecution related not to the fact that he was merely accused of possession but to the minuscule amount of cocaine involved. The Government made no offer to prove that it had prosecuted simply for possessing 367 milligrams of cocaine.

When we come to the second requirement, we must, if we are to dispense with a hearing, assume the correctness of the affidavits of Ross and his attorney. The attorney's affidavit alleged that prior to Ross' arrest the Assistant United States Attorney

> outlined three options available to Mr. Ross: (1) He could "cooperate fully," which he said would include testimony, and then entry into the Federal Witness Protection Program. In that event, no tax charges would be instituted; (2) He could act as an undercover informer, setting up an "event" to provide the Government with evidence sufficient to obtain an order permitting electronic surveillance under Title III of the Omnibus Crime Control and Safe Streets Act of 1968 and would then plead guilty to one tax count; (3) He could not cooperate at all, in which even the Government would charge him separately with respect to each and every case (tax and drugs) and "lock him up" separately on each.

Ross' affidavit averred that after his arrest the same Assistant United States Attorney

informed me that I was being arrested because I had refused to cooperate and give evidence against some "undisclosed owners." He further stated I would be jailed again and again, each arrest planned to maximize my time in jail, until I finally cooperated. Specifically, he informed me that this arrest was planned to coincide with my counsel's absence from New York and with the likelihood that no bail hearing would be had until banks had closed for the weekend. When I asked why I was arrested for an offense which my counsel had already said I would surrender on, he answered that it was to give me "a taste of jail since [I had] never been in one." He wanted me to know what it felt like and what my future held for me if I did not cooperate and did not tell him all the information he wanted.

I had, according to him, only two choices. I could cooperate and testify against the two "mafia bosses" and enter the Federal Witness Protection Program, or I could be arrested time after time, spend years in court and jail, or indeed, be killed by "the mafia."

"Interviews" with [the Assistant United States Attorney] or one or more FBI agents continued through the night. My flu medication was cruelly withheld from me despite occasional promises to give it to me "soon."

I recognize that the ability to offer leniency in return for cooperation is an indispensable tool of law enforcement. I also appreciate the undesirability of sanctioning a new defense unrelated to the merits that might require extensive pretrial proceedings. But I would want to think long and hard before deciding that selective prosecution, initiated by information, for a trivial offense not generally prosecuted, following conduct such as Ross and his counsel allege, did not go beyond constitutional bounds, see *United States v. Berrios, supra,* and *United States v. Sun Myung Moon, supra,* or constitute action "so outrageous that due process

principles would absolutely bar the government from invoking judicial processes to obtain a conviction, cf. *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952)." *United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973). The majority's phrases, "declined to aid" and "failure to cooperate", are hardly adequate to describe the kind of assistance that would require participation in the Federal Witness Protection Program. Undue harassment can arise from tactics addressed to the witness' mind as well as to the tires of his automobile, see *Angola v. Civiletti,* 666 F.2d 1, 2 (2 Cir.1981), and the prosecutor would hardly be so obtuse as to carry out his threats while this case was *sub judice.* See Note, *The Dilemma of the Intimidated Witness in Federal Organized Crime Prosecutions: Choosing Among the Fear of Reprisals, the Contempt Powers of the Court, and the Witness Protection Program,* 50 Fordham L.Rev. 582, 586–87 (1982).

The Government says in its brief that if it had been given the opportunity

it would have challenged several allegations in the moving affidavits, particularly those allegations concerning the Government's alleged effort to induce Ross to co-operate with the Government.

I would afford the Government that opportunity on the remand that must occur in any event, so that we can decide the question of selective prosecution on the basis of the facts rather than of disputed allegations by Ross and his attorney.