RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0174p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

IDRIS QUINTELL WILKES,

*Defendant-Appellant*.

No. 22-1436

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:21-cr-00042-1—Janet T. Neff, District Judge.

Argued: January 12, 2023

Decided and Filed: August 11, 2023

Before: STRANCH, MURPHY, and DAVIS, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Kenneth P. Tableman, KENNETH P. TABLEMAN, P.C., Grand Rapids, Michigan,
for Appellant. Kathryn M. Dalzell, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids,
Michigan, for Appellee. **ON BRIEF:** Kenneth P. Tableman, KENNETH P. TABLEMAN, P.C.,
Grand Rapids, Michigan, for Appellant. Kathryn M. Dalzell, UNITED STATES ATTORNEY'S
OFFICE, Grand Rapids, Michigan, for Appellee.

_____

## OPINION

_____

STEPHANIE DAWKINS DAVIS, Circuit Judge. Defendant Idris Quintell Wilkes was
convicted of being a felon in possession of a firearm in the district court for the Western District
of Michigan. He received the mandatory minimum sentence of 15 years' imprisonment under

the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e)(1), based on the district court's determination that his four previous cocaine-related Michigan convictions met the definition of a "serious drug offense." Wilkes contends, however, that Michigan law covers more cocaine-related substances than federal law in two ways: (1) Michigan's law includes [$^{123}$I] ioflupane and federal law does not, and (2) Michigan includes all the stereoisomers of cocaine and federal law does not. Accordingly, he argues that when the court applies the categorical approach under the ACCA, it must find that his prior convictions are not predicate serious drug offenses under the statute. The government maintains that the ACCA enhancement was properly applied because the state law is co-extensive with federal law, so there is no categorical mismatch.

Wilkes also argues that the district court improperly overruled his objection to the inclusion of proffer-protected information in the presentence report. According to the government, to the extent this error was raised below, it was harmless. And to the extent Wilkes raises new arguments to support this claim, he has failed to establish plain error.

For the reasons set forth below, we AFFIRM the decision of the district court in part and hold the appeal in abeyance in part, retaining jurisdiction to later resolve one of Wilkes's two challenges to the ACCA enhancement.

I.

A federal grand jury indicted Wilkes on the single charge of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1), 921(a), and 924(a). He pleaded guilty to the offense, acknowledging that he might be subject to a 15-year mandatory minimum sentence under the ACCA because of his prior felony drug convictions, which included four Michigan convictions for the delivery/manufacture of cocaine from 1995, 2006, and 2007. Though Wilkes ultimately pleaded guilty without the benefit of a plea agreement, he initially accepted such an agreement from the government that included an addendum, pursuant to which the government promised not to use any information he provided to enhance his sentence. The district court accepted Wilkes's plea.

Wilkes's presentence report (PSR) recommended armed career criminal status based on the convictions identified above. Wilkes objected to his designation as an armed career criminal,

on the ground that his Michigan convictions were not "serious drug offenses" because Michigan law covered more cocaine-related substances than federal law. More specifically, he argued that Michigan law swept more broadly than federal law because (1) federal law excluded [$^{123}$I] ioflupane at the time of his sentencing while Michigan did not; and (2) Michigan's schedule of controlled substances at the time of his sentencing included all of cocaine's stereoisomers, while the federal schedule only included cocaine's optical and geometric isomers, which he asserts do not include all of cocaine's stereoisomers. He also objected to the inclusion of proffer-protected information in the PSR and argued that it could not be used to affect his sentence.

The district court overruled both objections from the bench. Regarding Wilkes's objection to including proffer-protected information in the PSR, the district court relied on the reasoning of the PSR's authoring probation officer and noted that even if the court sustained the objection, the guidelines scoring would remain unaffected.

As to the issue of the alleged discrepancy between the Michigan and federal drug schedules, the district court agreed with the government that Michigan's inclusion of cocaine stereoisomers does not sweep more broadly than the federal schedules. While acknowledging the lack of any hard and fast scientific definition for the term "geometric isomers," the court reasoned that it must mean something and should not be interpreted as mere surplusage in the statute. Both sides retained chemistry experts who provided declarations and testified at the sentencing hearing. The government presented evidence from Dr. Scott E. Denmark. Wilkes offered expert testimony and a declaration from Dr. Gregory B. Dudley. The district court found Dr. Denmark's explanation more credible because it gave meaning to the language in the federal statute—"geometric isomer"—whereas Dr. Dudley's interpretation would essentially read that language out of the statute entirely. Based on this reasoning, the district court found that the state and federal definitions of cocaine were "categorically the same," overruling Wilkes's ACCA objection.

The district court sentenced Wilkes to 180 months' (15 years') imprisonment, the mandatory minimum sentence under the ACCA. This appeal followed.

II.

We apply a de novo standard of review to the district court's legal conclusions, including its "determinations regarding statutory construction" and its "conclusion that a prior conviction triggers a mandatory minimum sentence." *United States v. Mateen*, 764 F.3d 627, 630 (6th Cir. 2014) (en banc) (per curiam) (citations omitted). The ACCA provides that if a defendant convicted under § 922(g) has three previous convictions for a "serious drug offense," he is subject to a mandatory minimum sentence of 15 years' imprisonment. A serious drug offense includes a state law offense "involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance . . . for which a maximum term of imprisonment of ten years or more is prescribed by law." 18 U.S.C. § 924(e)(2)(A)(ii).

To decide whether a given conviction qualifies as a predicate offense under the ACCA, the court generally follows the "categorical approach," and may only consider the statutory definitions of the prior offenses, not the particular facts underlying them. *Taylor v. United States*, 495 U.S. 575, 600 (1990); *Shular v. United States*, 140 S. Ct. 779, 783 (2020) (applying categorical approach to serious-drug-offense convictions). Sentencing courts must presume that a conviction rested on nothing more than the least serious conduct, so courts may not count a conviction as one giving rise to a sentencing enhancement if the state statute of conviction covers more conduct than the federal law. *United States v. Burris*, 912 F.3d 386, 406 (6th Cir. 2019) (en banc); *see also Descamps v. United States*, 570 U.S. 254, 261 (2013) ("[I]f the statute [of conviction] sweeps more broadly than the generic crime, a conviction under that law cannot count as an ACCA predicate, even if the defendant actually committed the offense in its generic form.").

Where the statute of conviction is "divisible," meaning it lists elements in the alternative such that the statute "comprises multiple, alternative versions of the crime," the court uses the "modified categorical approach." *United States v. House*, 872 F.3d 748, 753 (6th Cir. 2017) (quoting *Descamps*, 570 U.S. at 262) (applying modified categorical approach to determine if drug conviction was a "controlled substance offense" under the Sentencing Guidelines); *see also Mathis v. United States*, 579 U.S. 500, 504 (2016) (applying the modified categorical approach to determine if a state conviction counted as an ACCA predicate offense). The modified

categorical approach requires the court to sort through the alternative elements to determine whether any of them "matches an element in the generic offense," and if one does, to consult "a limited class of documents . . . to determine which alternative formed the basis of the defendant's prior conviction." *House*, 872 F.3d at 753 (quoting *Descamps*, 570 U.S. at 257).

In *House*, we determined that Michigan Compiled Laws § 333.7401 (the statute of conviction for all four of Wilkes's prior state law cocaine convictions) is divisible. We therefore applied the modified categorical approach, concluding that the alternative crime from "Michigan's controlled-substance law—possession with intent to deliver—fits both the Sentencing Guidelines' generic offense—possession with intent to distribute or dispense—and [the defendant's] charge from his indictment." *Id*. at 753–54. Therefore, we affirmed the district court's application of the career-offender enhancement under the Sentencing Guidelines. *Id*. at 754. In *United States v. Pittman*, an unpublished decision relying on *House*, a panel of this court determined that the Michigan statute was further divisible by the type of controlled substance and thus, the fact that the Michigan schedules contained substances not found on the federal schedule mattered not. 736 F. App'x 551, 554–55 (6th Cir. 2018). That is, because the statute is further divisible by substance, and the specific controlled substance identified in the *Shepard*[1] documents in the defendant's case was both an element of the § 333.7401 violation and a federally prohibited substance, there was no mismatch. *Id*. at 555. For that reason, the court found no error in the district court's application of the career offender enhancement under the Sentencing Guidelines. *Id*.

Here, however, Wilkes asks the court to dig deeper into the comparison of cocaine under the Michigan statute of conviction for the purported predicate offenses and the federal Controlled Substances Act. He contends that Michigan law covers more cocaine-related substances than federal law, so his state convictions cannot qualify as "serious drug offenses" for purposes of the ACCA enhancement.

---

[1]*Shepard* documents are charging instruments, plea agreements, jury instructions, and similar materials as identified in *Shepard v. United States*, 544 U.S. 13 (2005). *See Mitchell v. United States*, 43 F.4th 608, 614 (6th Cir. 2022) (citing *Shepard*, 544 U.S. at 16).

III.

Wilkes initially argued in the district court and on appeal that Michigan law sweeps more broadly than federal law because federal law excluded [$^{123}$I] ioflupane at the time of his federal sentencing and Michigan law did not.  But during oral argument, Wilkes seemingly walked back this argument, assuming that it was foreclosed by our decision in *United States v. Clark*, 46 F.4th 404 (6th Cir. 2022).  In *Clark*, we adopted a "time-of-conviction" rule when applying the career offender enhancement under the United States Sentencing Guidelines.  More specifically, we held that courts must look to both state and federal law as each existed at the time of a defendant's state-law conviction to determine if the prior state offense qualifies as a "crime of violence" or a "controlled substance offense."  *Id*. at 408–09.  Wilkes made no argument that *Clark* is distinguishable.

After oral argument, Wilkes filed a motion, requesting that we hold his appeal in abeyance in light of the Supreme Court's grant of certiorari in *Jackson v. United States*, No. 22-6640 (U.S. Jan. 24, 2023).  The issue in *Jackson* mirrors one of the issues here, "[w]hether the classification of a prior state conviction as a 'serious drug offense' under the [ACCA] depends on the federal controlled-substance schedules in effect at the time of the defendant's prior state crime, the time of the federal offense for which he is being sentenced, or the time of his federal sentencing."  Brief of Respondent at I, *Jackson v. United States*, No. 22-6640 (U.S. Mar. 24, 2023).  *Jackson* also involves assessing the impact of the removal of [$^{123}$I] ioflupane from the federal controlled-substance schedules in 2015.

In a separate order, we have granted Wilkes's motion in part—holding in abeyance our decision on Wilkes's challenge based on [$^{123}$I] ioflupane.  As such, we need not decide whether *Clark*'s reasoning applies to the mandatory minimum sentencing enhancement under the ACCA in the same fashion as the career offender enhancement under the Sentencing Guidelines.

IV.

There is no reason, however, to delay a decision on Wilkes's second argument challenging his ACCA enhancement based on the sweep of Michigan's controlled substance laws.  The question of whether some states' laws ban more cocaine-related substances than

federal law because of the isomers included in the respective statutes has been percolating throughout various district courts and is ripe for decision.

As an initial matter, we note that Wilkes's argument may not even matter in his own case under the "modified categorical approach" adopted in *Pittman*. Even if Michigan law does include more cocaine-related substances than federal law, Wilkes's *Shepard* documents show that he was convicted of offenses involving "cocaine," not a cocaine-related substance. If the Michigan Supreme Court treated the "precise" cocaine substance as an element of the crime under Michigan law, Wilkes would have been convicted of a crime that federal law covered just as in *Pittman*. *Cf. People v. Wolfe*, 489 N.W.2d 748, 752 (Mich. 1992). Ultimately, however, we need not resolve this state-law question because Wilkes wrongly argues that Michigan law covers more cocaine isomers than federal law.

Michigan law bans cocaine and its "stereoisomers," among other things not at issue here. The parallel federal law bans cocaine and its "optical" and "geometric" isomers—mentioning nothing of "stereoisomers." We must thus decide if the term "stereoisomers" used in the Michigan law covers more substances than federal law. Wilkes argues that because the term "geometric" isomer found in federal law is unclear, Michigan law sweeps more broadly. That is, because the scope of geometric isomers cannot be discerned, Wilkes maintains that federal law does not sweep within its scope *all* of the stereoisomers of cocaine like Michigan law does. In determining that Michigan and federal law are coextensive, the district court looked to the rule of surplusage in finding Dr. Denmark's testimony more credible because it gave meaning to all the language selected by Congress. *See United States v. Jones*, 107 F.3d 1147, 1159–60 (6th Cir. 1997) ("[W]e must interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous." (quoting *Lake Cumberland Tr., Inc. v. U.S. EPA*, 954 F.2d 1218, 1222 (6th Cir. 1992))).

Our analysis begins, as it must, with the text of the statutes. The Controlled Substances Act (CSA) defines a "narcotic drug" as, among other things:

> (C) Coca leaves, except coca leaves and extracts of coca leaves from which cocaine, ecgonine, and derivatives of ecgonine or their salts have been removed.
>
> (D) Cocaine, its salts, **optical and geometric isomers**, and salts of isomers.
>
> (E) Ecgonine, its derivatives, their salts, isomers, and salts of isomers.
>
> (F) Any compound, mixture, or preparation which contains any quantity of any of the substances referred to in subparagraphs (A) through (E).

21 U.S.C. § 802(17) (emphasis added). Title 21 U.S.C. § 802(14) defines "isomer" as follows:

> The term "isomer" means the optical isomer, except as used in schedule I(c) and schedule II(a)(4). As used in schedule I(c), the term "isomer" means any optical, positional, or geometric isomer. **As used in schedule II(a)(4), the term "isomer" means any optical or geometric isomer**.

*Id.* (emphasis added). The CSA also defines "controlled substance" (the phrase used in the ACCA) as "a drug or other substance, or immediate precursor, included in" one of the CSA's drug schedules. 21 U.S.C. § 802(6). Schedule II of the CSA, in turn, lists the following substances:

> coca leaves, except coca leaves and extracts of coca leaves from which cocaine, ecgonine, and derivatives of ecgonine or their salts have been removed; cocaine, its salts, **optical and geometric isomers**, and **salts of isomers**; ecgonine, its derivatives, their salts, **isomers**, and **salts of isomers**; or any compound, mixture, or preparation which contains any quantity of any of the substances referred to in this paragraph.

21 U.S.C. § 812, Schedule II(a)(4) (emphasis added).[2] Like the CSA, Schedule II of the Code of Federal Regulations includes cocaine "isomers" and defines "isomer" as any optical or geometric isomer. *See* 21 C.F.R. § 1308.12(b)(4); 21 C.F.R. § 1308.02 ("Any term contained in this part

---

[2]The referenced definitions from §§ 802 and 812 were the same in 1995, 2006, and 2007 (the years of Wilkes's state court convictions), when he committed the instant offense (2021), and at the time of his federal sentencing (2022).

shall have the definition set forth in section 102 of the Act (21 U.S.C. 802) or part 1300 of this chapter.").[3]

> Finally, Michigan's Schedule 2 includes as controlled substances, the following:
>
> Coca leaves and any salt, compound, derivative, or preparation thereof which is chemically equivalent to or identical with any of these substances, except that the substances do not include decocainized coca leaves or extraction of coca leaves which extractions do not contain cocaine or ecgonine. The substances include cocaine, its salts, **stereoisomers, and salts of stereoisomers when the existence of the salts, stereoisomers, and salts of stereoisomers is possible within the specific chemical designation.**

Mich. Comp. Laws § 333.7214(a)(iv) (in effect 1995-present) (emphasis added).

The parties agree that cocaine has eight stereoisomers, and that both state and federal definitions include cocaine itself as well as its mirror-image stereoisomer, which is the "optical" isomer or "enantiomer." The point of contention is whether federal law—specifically, the term "geometric isomers"—covers the remaining six stereoisomers, also known as diastereomers.

As an initial matter, the plain meaning of the term eludes immediate conception. Isomer is defined in federal law, but "geometric isomer" is not. And because the phrase sounds in chemistry, a highly specialized field about which the average lay person often enjoys only a rudimentary understanding, assessing ordinary meaning requires a few tools.

One such tool is the rule relating to surplusage. Here, the district court appropriately concluded that "geometric isomers" must mean *something* and accurately observed that adopting Wilkes's position would render the statutory term a nullity. Courts avoid constructions of statutes that would render Congress's chosen words superfluous. *Lake Cumberland*, 954 F.2d at 1222. Instead, courts "must give effect, if possible, to every clause and word of a statute." *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (citation omitted). Courts also presume that "when 'Congress includes particular language in one section of a statute but omits it in another'"—"let alone in the very next provision"—it "intended a difference in meaning." *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).

---

[3]The pertinent language regarding isomers was the same at the time of Wilkes's prior state court convictions, when he committed the instant offense, and when he was sentenced.

With these statutory construction principles in mind, we find it significant, and certainly not meaningless, that Congress used the term "geometric isomer" in its definition of "isomer" for cocaine only, while "isomer" more generally means only the optical isomer. *See* 21 U.S.C. § 802(14). Logically, this means that a geometric isomer must be something different from an optical isomer and that some additional isomer of cocaine is covered.

Having agreed with the district court that the words "geometric isomer" must be given effect, we next examine what Congress meant when it selected the additional term "geometric isomer" for cocaine. A court "normally interprets a statute in accord with the ordinary public meaning of its terms at the time of its enactment." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1738 (2020). As such, the question is not what "geometric isomer" meant in 2022 when the district court sentenced Wilkes, but rather, what the ordinary public meaning of this term was when the federal statute was enacted. This requires us to "orient" ourselves to the time of the statute's adoption, here, 1984. While we must not "woodenly interpret a legal text in a vacuum," dictionary definitions are often the starting point for our textual interpretations. *United States v. Tate*, 999 F.3d 374, 378 (6th Cir. 2021) (internal quotation marks and citation omitted); *see also United States v. Grant*, 979 F.3d 1141, 1144 (6th Cir. 2020) (observing that a court should not "mechanistically pars[e] down each word of the statute to its dictionary definition, no matter the resulting reading that would give the law"); Antonin Scalia, *A Matter of Interpretation* 23 (1997) ("A text should not be construed strictly, and it should not be construed leniently; it should be construed reasonably, to contain all that it fairly means.").

The expert reports in this matter, along with standard and scientific dictionary definitions from the pertinent time frame, including those from the International Union of Pure and Applied Chemistry Compendium of Chemical Terminology ("IUPAC Gold Book"), provide important historical context for the meaning of the terms "optical isomer" and "geometric isomer." Dr. Denmark explains that stereoisomers (the term used in Michigan law) are defined as either enantiomers or diastereomers. The figure below shows cocaine and all its stereoisomers:



**Figure 6.** Natural (*R*)-cocaine and all of its stereoisomers.

*(R)*-cocaine is the naturally occurring enantiomer of cocaine and *(S)*-cocaine is its mirror-image enantiomer.

Dr. Denmark explains that the definitions of optical and geometric isomers (the terms used in federal law) have changed over time. Citing a historical text on stereochemistry, E.L. Eliel et al., *Stereochemistry of Carbon Compounds* 4–5 (1962), Denmark indicates that optical and geometric isomers were considered types of stereoisomers. Dr. Denmark's explanation is consistent with the definitions of stereochemistry and isomerism from the early 1980s. *See The Condensed Chemical Dictionary* 969 (Gessner G. Hawley, ed., 10th ed. 1981) (defining "stereochemistry": "Stereoisomers fall into two broad classes: optical isomers and geometric (or cis-trans) isomers"); *see also Concise Science Dictionary* 363–64 (1984) (defining "isomerism": "Optical isomerism is one form of [stereoisomerism]. Another type is *cis-trans isomerism* (formerly *geometrical isomerism*), in which the isomers have different positions of groups with respect to a double bond or central atom[]"). Then, citing texts from the mid-1990s, Denmark explains that the scientific community has abandoned the foregoing terms as "imprecise." Dr. Denmark clarifies that "optical" isomer is an ill-defined term and is sometimes used for enantiomers specifically and sometimes more broadly for any type of stereoisomers. Notably, pertinent contemporaneous scientific definitions are consistent with Dr. Denmark's explanation that "optical" isomer is sometimes used for enantiomers and sometimes more broadly for any type of stereoisomer. *Compare The Condensed Chemical Dictionary*, *supra*, at 760 (defining "[o]ptical isomer" to include enantiomers and diastereoisomers (non-mirror

images)), *with Concise Science Dictionary*, *supra*, at 489–90 (equating optical isomers and enantiomers (mirror images)). Dr. Denmark further explains that given the current understanding of the terms optical (enantiomers) and geometrical (diastereomers), the federal definition of cocaine covers natural (*R*)-cocaine, its enantiomer (*S*)-cocaine and all of the other six stereoisomers.

In the end, Dr. Denmark concludes that the use of the terms "optical" and "geometric" in the federal law is coextensive with the definition of "stereoisomer" under Michigan law. Thus, according to Dr. Denmark, optical and geometric isomers encompass all eight stereoisomers of cocaine.

Wilkes's expert, Dr. Dudley, agrees that there are eight known stereoisomers of cocaine: cocaine, its enantiomer, and six known diastereomers. Dr. Dudley opines, however, that it is unclear whether the federal law intended to cover all six diastereomers based on the use of the terms "optical" and "geometric." Dr. Dudley agrees with Dr. Denmark that "optical isomer" refers to "enantiomer." His opinion differs as to the most appropriate meaning of "geometric isomers." Dudley says that "geometric isomers" means "cis-trans" isomers, but that cocaine does not have any "cis-trans" isomers. He thus testified that the number of stereoisomers "unambiguously" included in the federal definition is only two. When asked about what the term "geometric isomer" could mean, Dr. Dudley explained that sometimes optical and geometric isomers are conflated with other stereoisomers, including diastereomers. In this regard, and consistent with Dr. Denmark's opinion, he conceded that if "these terms are conflated with other diastereomers, then they could include all of the other stereoisomers as well." His disagreement is that, *currently*, such terminology is neither proper nor widely accepted in the field of chemistry. But his disagreement as to the currently prevailing terminology in the field does not help in discerning the ordinary, public meaning of "geometric isomer" *in 1984*.

The historical, scientific context provided by both experts (suggesting that "geometric isomers" has, at times, been understood to encompass the six diastereomers of cocaine) is consistent with the other contemporaneous evidence that the court must consider in determining whether the terms optical and geometric isomers in the statute encompass all stereoisomers of cocaine. In addition to dictionary definitions, two recent Supreme Court cases are instructive.

First, while *Bostock* makes clear that legislative history may not be used to contradict unambiguous text, it also grants that such historical sources are sometimes useful in evaluating the meaning of a statutory phrase at the time of adoption—particularly in light of potential "shifts in linguistic usage." 140 S. Ct. at 1750. This suggests that we may look to legislative history for *evidence* of a word's meaning in a statute when it was adopted. *See also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 388 (2012). Second, where roughly contemporaneous with the enactment of a statute, the government's "early, longstanding, and consistent interpretation of a statute [or regulation] could count as powerful *evidence* of its original public meaning." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2426 (2019) (Gorsuch, J., concurring). Thus, we may also look to early government interpretations for evidence of the original public meaning of the terms "optical" and "geometric isomers" of cocaine.

In that vein, and for those who find it useful, the legislative history of the CSA shows that Congress added these terms because it believed that "clandestine manufacturers" were attempting to evade the reach of the law by manufacturing "optical and geometric isomers of cocaine." S. Rep. No. 98-225, at 263 (1983), *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3445. Importantly, Congress's purpose in adding this language was to address the "isomer defense." *Id.*

The CSA's statutory history confirms this point. *See* Scalia & Garner, *supra*, at 256. Before Congress made its changes in 1984, many courts had discussed the "isomer defense"— the very defense Congress sought to address with the addition of optical and geometric isomers to the statute. For example, in *United States v. Ross*, the defendant asserted the "cocaine isomer strategy." 719 F.2d 615, 617 (2d Cir. 1983) (quoting *United States v. Ortiz*, 610 F.2d 280, 281 (5th Cir. 1980)). At that time, federal law banned only "[c]oca leaves and any salt, compound, derivative, or preparation of coca leaves, and any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances." *Id.* (quoting 21 U.S.C. § 812(c), Schedule II(a)(4) (1976)). The court explained that cocaine has eight isomers, only one of which is a derivative of the coca leaf. *Id.* The seven other isomers were synthetic and thus the government had to prove at trial that the substance possessed by the

defendant was either natural cocaine, or chemically equivalent or identical. *Id.* at 617–18; *see also United States v. Francesco*, 725 F.2d 817, 820 n.1 (1st Cir. 1984) (collecting cases).[4] At that time, in terms of isomers, courts interpreted federal law to ban only L-cocaine (the isomer naturally derived from the coca leaf) and not any of cocaine's other isomers. *Ross*, 719 F.2d at 618. So, defendants attempted to avoid conviction by arguing that they possessed one of the other seven isomers, such as D-Cocaine. *Ross*, 719 F.2d at 618; *United States v. Hall*, 552 F.2d 273, 275 & n.1 (9th Cir. 1977) (addressing defendant's desire for a jury instruction that federal law did "not prohibit distribution of isomers of cocaine which are not the natural product of the coca leaf or its equivalent").[5] It follows that, in adding the terms "optical" and "geometric" isomers, Congress intended to capture *all* the known isomers of cocaine. The contrary reading proposed by Wilkes would leave the "isomer defense" alive and well and fail to give Congress's 1984 statutory changes "real and substantial effect." *Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833, 1844 (2018) (quoting *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 356, 360 (2016)).

There is also early evidence that the Drug Enforcement Agency (DEA), which administers the scheduling of controlled substances, understood "optical isomer" to include cocaine's enantiomer and "geometric isomer" to include cocaine's six diastereomers. In 1986, after Congress added the isomer definition, the DEA incorporated it into the Code of Federal Regulations through notice-and-comment rulemaking. *See* Schedules of Controlled Substances, Changes in Definitions, 51 Fed. Reg. 15,317 (Apr. 23, 1986). In doing so, the DEA explained that the new language incorporating cocaine's "optical and geometric" isomers includes cocaine and its optical isomer ("the levorotatory and dextrorotatory forms of cocaine"), "as well as the

---

[4]While the court spoke in terms of eight "isomers," instead of "stereoisomers," it is important to remember that stereoisomers are isomers. *See Webster's Third New International Dictionary* 2238 (1981) (defining stereoisomer as "any one of the isomers in an example of stereoisomerism;" defining stereoisomerism as "isomerism in which atoms are linked in the same order but differ in their arrangement in space"); *Webster's II New Riverside University Dictionary* 1137 (1984) (defining stereoisomerism as "isomerism caused by differences in the spatial arrangements of atoms in a molecule"); *The American Heritage Dictionary* 1195 (Second College Edition, 1982) (defining stereoisomer as "[a]n isomer;" defining stereoisomerism as "isomerism created by differences in the spatial arrangement of atoms in a molecule").

[5]At that time, the case law discussed "L-cocaine," which is natural cocaine (identified as "levorotatory" by the DEA), and "D-cocaine," which is one of the seven other isomers of cocaine (identified as "dextrorotatory" by the DEA). L-cocaine is the same as *(R)*-cocaine, or the naturally occurring enantiomer of cocaine. D-cocaine is the same as *(S)*-cocaine or its mirror image enantiomer.

diastereomers."  *See* Schedules of Controlled Substances; Changes in Definitions, 51 Fed. Reg. 5370, 5371 (proposed Feb. 13, 1986).  The DEA expressly identified cocaine's six diastereomers as "pseudococaine," "allococaine," and "pseudoallococaine"[6] along with "their optical isomers." *Id.*  Thus, the DEA understood that part of the language added by Congress to expand the definition of cocaine ("geometric isomers"), included all six diastereomers:

> Section 507(c) of the Dangerous Drug Diversion Act of 1984 amends Schedule II(a)(4) to specifically list cocaine and ecgonine and their salts, isomers, derivatives and salts of isomers and derivatives.  **Coupled with the amended definition of isomer which includes optical and geometric isomers of cocaine** and ecgonine, the listing of these substances expands the Schedule II control of cocaine to include **the isomeric forms of cocaine**, ecognine and their derivatives. Section 1308.12 Schedule II(b)(4) of 21 CFR will be revised to reflect this statutory change.

*Id.* (emphasis added).  The DEA expressed its understanding in response to Congress's use of "geometric isomer," and signaled its early interpretation of this term.  This provides further evidence of the term's public meaning at the time of its enactment.  *See Bostock*, 140 S. Ct. at 1738, 1750.  In particular, this early interpretation indicates that the addition of cocaine's "optical or geometric isomers" to the CSA was reasonably read to capture all eight isomers of cocaine—the same substances that Michigan law prohibits—the eight stereoisomers of cocaine, or cocaine, cocaine's enantiomer, and cocaine's six diastereomers.

Taken together, the historical evidence from the experts, the definitions set forth in standard and scientific dictionaries from the relevant time frame, the legislative history, the contemporaneous case law discussing the isomer defense, and the DEA's early interpretation all point toward a single unified conclusion: the meaning of the term "geometric isomers" in the CSA includes the six diastereomers of cocaine.  This means that the federal statutory term— optical and geometric isomers—is coextensive with the Michigan statutory term, stereoisomers.

---

[6]These diastereomers align with Dr. Denmark's chart, which identifies the six stereoisomers of cocaine (in addition to naturally occurring cocaine and its enantiomer) as *(R)-* and *(S)*-pseudococaine, *(R)-* and *(S)*-allococaine, and *(R)-* and *(S)*-allopseudococaine.   While Dr. Denmark's chart refers to "allopseudococaine" instead of "pseudoallococaine" (as identified by the DEA), these terms appear to be synonyms. *See* definition of "pseudoallococaine," National Library of Medicine, https://pubchem.ncbi nlm.nih.gov/compound/Pseudoallococaine (last visited Jan. 20, 2023).

Accordingly, we conclude that Michigan law does not cover more isomers of cocaine than federal law and the district court properly rejected Wilkes's contrary argument.

V.

At sentencing, Wilkes also objected to the inclusion of proffer-protected information in his PSR on the ground that the information "may not be used to affect [his] sentence." The probation officer who prepared the PSR acknowledged that the information should have "no impact in the guideline calculations." But the officer declined to strike the information from the report entirely, explaining that he labeled the information "proffer protected" and advised in the report itself that the information "cannot be used to calculate the guideline range, pursuant to USSG § 1B1.8." The probation officer explained that the Guide to Judiciary Policy "expressly provides for the inclusion of such information." The district court overruled the objection, accepting and adopting the probation officer's "full[] and accurate[]" explanation and concluding that the information "would not affect the scoring in this case."

Any error the district court may have committed is harmless. This is so because the district court did not consider the information and because Wilkes received the statutory mandatory minimum term—the lowest possible sentence. *See* Fed. R. Crim. P. 52(a) (errors that do not affect substantial rights "must be disregarded"); *United States v. Butts*, 40 F.4th 766, 774–75 (6th Cir. 2022) (error harmless where court "could not have imposed a lower sentence"). Indeed, Wilkes acknowledges that the information was not used to affect his sentence.

On appeal, Wilkes expands his argument, contending that the contents of the PSR "can affect how the Bureau of Prisons classified him which can affect his prison placement." He also seems to suggest that the government did not keep its promise not to use the information against him, by giving it to the probation department.

These arguments were not raised below and are thus subject to plain error review. *See United States v. Vonner*, 516 F.3d 382, 391–92 (6th Cir. 2008) (en banc). Plain-error review involves four prongs: (1) "an error or defect—some sort of '[d]eviation from a legal rule'—that has not been intentionally relinquished or abandoned" by the appellant; (2) "the legal error must be clear or obvious, rather than subject to reasonable dispute"; (3) "the error must have affected

the appellant's substantial rights," which generally means "he must demonstrate that it 'affected the outcome of the district court proceedings'"; (4) if the foregoing prongs are satisfied, "the court of appeals has the *discretion* to remedy the error" if it "'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Puckett v. United States*, 556 U.S. 129, 135 (2009) (quoting *United States v. Olano*, 507 U.S. 725, 732–34, 736 (1993)). "[T]he burden of establishing entitlement to relief for plain error is on the [appellant] claiming it." *United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004).

Wilkes has made little effort to show how he can satisfy all four prongs of the plain error test and thus, his claim fails on this basis alone. *See, e.g.*, *United States v. Swanson*, No. 22-3095, 2022 WL 17489125, at *2 (6th Cir. Dec. 7, 2022) (explaining that even if the defendant "could establish that the district court's explanation of the minimum sentence was erroneous, he cannot prevail under plain error review because he failed to advance any argument as to the other prongs of the plain error test"). Moreover, Wilkes has not shown that he can overcome this court's decision in *United States v. Jackson*, which held that the inclusion of proffer-protected information in the PSR, where it was not used to enhance the defendant's sentence, is not plain error. 635 F.3d 205, 209 (6th Cir. 2011). For these reasons, we affirm the district court's decision overruling Wilkes's objection to the inclusion of the proffer-protected information in the PSR, where such information was not considered in determining his sentence.

VI.

For these reasons, we AFFIRM the district court's decision to the extent (1) it found that federal law covers the same isomers of cocaine as Michigan law and (2) it overruled Wilkes's objection to the inclusion of proffer-protected information. We retain jurisdiction over Wilkes's challenge to his ACCA enhancement based on [$^{123}$I] ioflupane.